**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard WILLIAMS, William Scott
Hames, Defendants–Appellants.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry Ronald DUKE, Defendant–
Appellant.**

Nos. 90–8575, 91–8284.

United States Court of Appeals,
Eleventh Circuit.

Feb. 27, 1992.

Tom Jarrard, Gainesville, Ga. (court appointed), for Williams.

Steven H. Sadow, Atlanta, Ga., for Hames.

Bruce S. Harvey, Atlanta, Ga., for Duke.

Mary Jane Stewart, Asst. U.S. Atty., Atlanta, Ga., for the U.S.

Before FAY and HATCHETT, Circuit Judges, and GIBSON *, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In these consolidated appeals, we reverse the convictions of two of the appellants because relevant evidence regarding how much money the government paid an informant in prior cases was excluded on the basis that such evidence would be too prejudicial to the government's case.

---

\* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

## FACTS

In November, 1989, William Scott Hames contacted Harry Lee about a marijuana contact in Texas, known to them as J.D. who, unbeknownst to them, served as a government informant. Thereafter, Lee contacted Larry Ronald Duke. After Hames showed Lee and Duke marijuana samples, they immediately discussed buying a large quantity of marijuana, with Duke paying Hames and Lee $200,000 each for their participation. As a result of these discussions, Hames and Lee flew to Corpus Christi, Texas, to discuss buying marijuana from the informant. Lee found the marijuana unsatisfactory, and he and Hames returned to Atlanta, Georgia, to report the outcome to Duke. Shortly thereafter, Hames informed Lee that the informant had something that he wanted to show them.

In late November, 1989, Hames and Lee flew to Dallas, Texas, to meet with Duke and to discuss a scheduled meeting with the informant. On December 5, 1989, Deputy Sheriff James Spencer, working undercover, and the informant met Hames and Lee at the Dallas–Fort Worth Airport and drove them to Corsicana, Texas. Deputy Sheriff Ted Brooks, who at the time was also working undercover, acted as the drug organization's leader.[1] While in Corsicana, Hames, Lee, and the undercover law enforcement officers discussed the marijuana deal. According to Lee, Duke wanted 18,-000 pounds of marijuana delivered to Georgia. The undercover officers showed Hames and Lee about 500 pounds of marijuana. Also, Lee told Deputy Spencer that he had a buyer in Houston from Atlanta who wanted to purchase marijuana, and a buyer in Atlanta from Tallahassee, Florida who wanted to buy 7,500 pounds of marijuana.

On December 7, 1989, Deputy Spencer met with William Harvey Cox, the buyer from Atlanta and negotiated with Hames and Lee to deliver approximately 400 pounds of marijuana. Deputy Spencer sold

---

1. Law enforcement officers later arrested Deputy Sheriff Brooks on marijuana charges.

the marijuana at $500 per pound, and Hames and Lee sold it to Cox for $575 per pound. Hames and Lee retained $26,000 in profit, and the marijuana load was subsequently recovered and Cox's driver arrested. Because they could not agree on the larger deal, Hames and Lee returned to Georgia. Thereafter, the informant called Hames and told him the sellers would deliver the marijuana to Georgia.

On December 20, 1989, Deputy Spencer met with Hames and Lee in the Atlanta area and discussed buying 16,000 pounds of marijuana at $450 per pound. Hames presented a 14-day plan, which Duke had prepared, and Lee explained that the marijuana would be stored at Duke's "Little Mulberry Farm" (the farm) in Bartow County, Georgia. Hames assured Deputy Spencer that Duke was the largest marijuana dealer on the eastern seaboard. After these talks, the deputies returned to Texas.

On December 26, 1989, Deputy Spencer and other law enforcement officers returned to Georgia with approximately 4,800 pounds of marijuana. On December 27, 1989, Hames, Lee, and Bruce McArthur met with Deputy Spencer and further discussed the marijuana sale. On December 28, 1989, Hames, Lee, Deputy Spencer, the informant, and other law enforcement officers went to the farm. Lee also took Deputy Spencer and Deputy Brooks to a house on Trickum Road to introduce them to Duke. In the meeting with Duke, the officers explained that they had three truckloads of marijuana weighing 16,000 pounds. Duke discussed his marijuana operation, including information regarding warehouses he owned across the country, and including boasting that he recently moved 70,000 pounds of marijuana in four days. He further assured them that he could move the first truckload of marijuana in about 90 minutes, and explained the off-loading and storage of the marijuana at the farm.

On December 29, 1989, the undercover agents delivered 4,800 pounds of marijuana to the farm where Duke, Hames, Lee, McArthur, and Richard Williams were present. Deputy Spencer provided a manifest, which he and Deputy Jones had prepared listing the box numbers and their weights. Thereafter, the men present formed an assembly line and unloaded the marijuana into the basement.

After the marijuana was unloaded, Duke, Williams, Lee, and Deputies Spencer and Brooks went inside the house and discussed the distribution plan. Duke changed the plan from moving out a 500-pound load and then a 1,000-pound load to moving the marijuana in 200-pound loads in an automobile driven by Williams. According to the new plan, Lee and Deputy Brooks would go to a hotel and wait for Williams to bring Deputy Brooks the money from the 200-pound load. Duke stressed that the marijuana and the money must never be in the same place at the same time. He also indicated that he had one 10,000-pound buyer who paid in $2,000 bundles, and one buyer who paid in $5,000 bundles.

After the marijuana was in the basement, the deputies gave the arrest signal, and law enforcement officers apprehended all the participants, read them their *Miranda* rights, and loaded the marijuana back on the truck. Agents then returned the truck to the Georgia Bureau of Investigation in Decatur, Georgia, where an agent took samples from the boxes and determined that the samples were marijuana.

After arrest, Hames claimed that throughout the negotiations, he served as a confidential informant through an agreement with the informant. Hames, however, admitted that he never asked the informant which law enforcement agency he worked for, never made any tape recordings or notes, was never debriefed by a law enforcement officer, and never were any law enforcement officers identified to him prior to his arrest. The informant, however, denied ever making such an agreement with Hames.

## PROCEDURAL HISTORY

A grand jury indicted Duke, Hames, Lee, McArthur, Williams, and others with conspiring to possess with the intent to distribute in excess of 1,000 kilograms of marijuana and attempted possession with the intent to distribute in excess of 1,000 kilo-

grams of marijuana, in violation of 21 U.S.C. § 846.

At trial, Williams denied involvement in this crime, claiming he was friends with Douglas Taylor, the lessee of the house, needed a place to stay, and had only arrived at the house the night before on his way to Detroit, Michigan. It was his understanding that Taylor was expecting a furniture delivery. He denied unloading the marijuana or even seeing any marijuana, asserting that he believed any noise was caused by movers delivering furniture. Moreover, Hames and Lee admitted that the first time they had seen Williams was the day they were arrested.

Also, Duke admitted being in Atlanta during December, 1989, yet denied meeting with Hames and Lee to discuss a marijuana deal. He further stated that his brother owned the farm, that he had no interest in it, and that he had no knowledge or involvement in the marijuana sale.

The jury convicted Duke, Hames, and Williams, the appellants in these consolidated appeals. The court sentenced Duke to life imprisonment without release, 10 years supervised release, a $25,000 fine, and special assessments totaling $100. The court sentenced Williams to 264 months imprisonment on each count to run concurrently, 10 years supervised release, and a $100 special assessment. Finally, it sentenced Hames to 360 months imprisonment, 5 years supervised release, and $100 in special assessments.

## ISSUES

The following issues are presented on appeal: (1) whether the district court correctly excluded testimony concerning prior financial payments the informant received from law enforcement authorities; (2) whether the district court correctly rejected Duke's claim that he had been a victim of sentencing entrapment; and (3) whether

the district court correctly imposed Duke's sentence pursuant to 21 U.S.C. § 851, rejecting his claim that the statute deprived him of his constitutional rights.

## CONTENTIONS

The appellants contend that the district court abused its discretion in not allowing evidence regarding the informant's financial motive. Duke also contends that the government was involved in the drug transaction to such an extent that he was rendered a victim of sentence entrapment. Finally, Duke challenges 21 U.S.C. § 851(e)'s constitutionality, arguing that this statute precludes him from submitting a writ of habeas corpus, in violation of his equal protection and due process rights.

## DISCUSSION

*Informant's Testimony*

■ The district court has broad discretion in ruling upon the relevancy and admissibility of evidence. *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir.1989). This discretion, however, does not extend to the exclusion of crucial relevant evidence necessary to establish a valid defense. *Kelly*, 888 F.2d at 743; *United States v. Cohen*, 888 F.2d 770, 777 (11th Cir.1989).

■ Hames's sole defense was that he was under a good faith belief that he was working in cooperation with the informant. When Hames called the informant to testify, the court allowed the informant's testimony regarding how long he had been a paid informant, the percentage received from successful operations, his previous arrests and dispositions, and the amount of money paid in this case.[2] The court, however, excluded all testimony and defense exhibits indicating the total amount of money the informant had received since becoming a paid government informer, ruling the

---

**2.** Texas officials arrested the informant on March 18, 1987, at a United States Border Patrol checkpoint with more than 100 pounds of marijuana and a firearm. The government immediately charged him in a federal criminal complaint, and a grand jury indicted him on April 3,

1987. On April 28, 1987, however, the government dismissed the indictment in return for his cooperation in future drug transactions. In return, the government gave the informant twenty-five percent of all seized assets.

evidence irrelevant.[3] The government argues that the court correctly excluded this evidence, because it was irrelevant and unduly prejudicial. Both in brief and at oral argument, the government insisted that the amount of the payment, if introduced before the jury, would "inflame and unduly prejudice the jury [against the government]".

By October, 1989, the government had paid the informant nearly $450,000 in reward money. Moreover, at the time of the informant's arrest in March, 1987, he only earned $1,000 per month. Additionally, at trial, the informant testified that he did not expect to receive twenty-five percent of the possible $7.2 million involved in the transaction, which somewhat misled the jury in calculating his compensation.[4] Thus, after this testimony, the defense sought to introduce evidence proving that the informant had received twenty-five percent of a $1,258,000 seizure. Without this evidence, the jury had absolutely nothing to equate the twenty-five percent reward. This exclusion denied both Hames and Williams a fair trial. Because the informant actually testified in Williams and Hames's trial, we hold that the district court abused its discretion by prohibiting them from putting into evidence the amount of prior financial payments made to the informant.

The jury has the right to know what may be motivating a witness, especially a government paid, regularly employed, informant-witness. If the amount paid an informant is felt by the government to be too prejudicial for an American jury to hear about, the solution is for the government to make reasonable payments; the solution is not for the court to rule the evidence irrelevant as too prejudicial. We have never approved of a rule which makes small payments to informants admissible, but large, outrageous payments inadmissible. The large and outrageous payments may be just the kind that are of the most help to the jury in arriving at the truth.

Although the informant did not testify at Duke's trial, Duke contends that the government's admission of video and audio tapes with the informant's likeness and voice essentially serves as "testimony" and he should have been allowed to impeach this testimony. Likewise, he argues that the court abused its discretion in excluding evidence that an undercover officer was arrested after this investigation on drug charges. The law is clearly established that one may not introduce evidence to impeach a witness who does not testify. *See United States v. Wolfe,* 766 F.2d 1525 (11th Cir.1985). Thus, we affirm Duke's conviction.

### Duke's Sentence

Duke challenges his sentence on two grounds: (1) he was a victim of sentence entrapment and (2) 21 U.S.C. Section 851(e) is unconstitutional. Duke stresses the fact that the informant introduced government agents into the operation and after the failed Cox transaction, the government allowed Hames and Lee to keep a $26,000 commission. He also points out the enormous incentive in selling the marijuana at half the market price, and the government's delivery of the marijuana without payment. Duke argues that he received an increased sentence because the government

---

**3.** The district court found the money amounts outrageous ("one of the worst situations [the court] had ever seen") and prejudicial to the government's case.

**4.** During the government's cross-examination, the following exchange took place.

Q. Did you ever expect for the agents to really seize 7.2 million dollars?
A. No, Ma'am.
Q. Why not?
A. *It never happens that way.*
Q. You didn't know how much?
A. That's correct.

Q. To get to the 7.2 million dollars, the marijuana would have had to have been turned over and sold, wouldn't it?
A. As it turned—as it turned out, yes, Ma'am.
Q. The law enforcement authorities had no intent of doing that, did they?
A. Absolutely not.
Q. You knew that, didn't you?
A. Yes, Ma'am.
Q. But you did expect you might get money from seizures of what amount of money might be there or from other assets, didn't you?
A. Yes, Ma'am.

set the marijuana quantity; thus, he argues that the government manipulated the transaction in order to get the mandatory minimum sentence.

■ First, as a matter of law, we reject Duke's sentence entrapment theory. *See, United States v. Markovic,* 911 F.2d 613, 616 (11th Cir.1990) (sentence entrapment no longer a viable defense); *United States v. Struyf,* 701 F.2d 875, 877 n. 6 (11th Cir. 1983) (sentence entrapment defense did not survive *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976)). Because this circuit rejects this theory as a defense, we need not address it further.

■ Secondly, section 851(a) prohibits the court from using a prior conviction to enhance a sentence, unless the government files an information listing the previous conviction. Section 851(e) states:

No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.

Duke argues section 851(e) denied him the right to challenge his previous conviction with a writ of habeas corpus, thus violating his due process and equal protection rights. Other courts have addressed this issue and found the statute constitutional. *See, United States v. Kinsey,* 843 F.2d 383 (9th Cir.1988); *Cirillo v. United States,* 666 F.Supp. 613 (S.D.N.Y.1987); *United States v. Cirillo,* 566 F.Supp. 1340 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1445 (2d Cir.1984).

In *Kinsey,* the Ninth circuit stated:

We hold that the sentence enhancement provisions of Title 21 U.S.C. Section 841(b)(1)(A) and related Section 851(e) do not deny a criminal defendant his or her constitutional right to a jury trial but set forth aggravating circumstances the presence of which require a trial court to increase the sentence of a habitual offender.

*Kinsey,* 843 F.2d at 391–392.

Additionally, in *Cirillo v. United States,* 666 F.Supp. 613 (S.D.N.Y.1987), the court allowed the government to use a forty-two year old criminal conviction to enhance Cirillo's sentence. The court opined:

Without [section 851(e)'s five year limitation period], records of prior criminal convictions, going back many years, as for example in this case, forty-two years, would have to be preserved. The likelihood is that those persons who played a role, whether on behalf of the prosecution, defense, or witnesses, no longer would be available to give direct testimony as to alleged events attendant upon the entry of the plea under attack. Section 851(e) is wholly reasonable, both to effectuate the legitimate purposes of enhanced sentencing for recidivists, and to eliminate a host of practical problems with respect to ancient records absent such a provision.

*Cirillo,* 666 F.Supp. at 616. We agree.

In this case, the government filed a sentencing information indicating that Duke had two prior drug convictions which enhanced his sentence pursuant to 21 U.S.C. §§ 851, 846, and 841(b)(1)(A). Moreover, the prior convictions and drug quantities led to his life imprisonment without release sentence. Section 851(e)'s five-year limitation is reasonably tailored to impose enhanced sentences on recidivists. Accordingly, it is not unconstitutional. Consequently, the district court properly enhanced Duke's sentence.

Finally, Duke and his coconspirators set the quantity of marijuana when Hames and Lee produced the fourteen-day plan for distributing 16,000 pounds of marijuana for $7.2 million. Additionally, Hames and Lee told Deputy Spencer that they could handle large quantities, and Duke had a prior conviction for importing 18 tons of marijuana. The appellants said they could move large quantities, and Duke tried to move this large quantity, but with the wrong people. The fact that Duke now says, "the deal was too good to be true" is of no legal significance.

For the foregoing reasons, we reverse and remand this case as to Hames and

Williams for a new trial. Additionally, we affirm Duke's convictions and sentences.

AFFIRMED in part, and REVERSED and REMANDED in part.