**UNITED STATES of America, Plaintiff,**

v.

**Ruben FRANCO, Defendant.**

**Nos. 93 C 4199, 88 CR 571.**

United States District Court,
N.D. Illinois, E.D.

July 14, 1993.

Ruben Franco, pro se.

No appearance filed for respondent.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Ruben Franco ("Franco") has just filed a motion under 28 U.S.C. § 2255 ("Section 2255"), asserting two grounds (copied here verbatim) for challenging the 78 month custodial sentence that he is now serving at FCI Sandstone:

> An investigative technique which effectively lets law enforcement personnel pre-determine a criminal defendant's sentencing range is a mitigating circumstance of a kind or to a degree not adequately taken

into consideration by the sentencing commission.

Petitioner received ineffective assistance of trial and appellate counsel.

Although the statement of the first of those two issues is somewhat obscure in Section 2255 terms, this opinion will attempt to deal with it in the clearer fashion that Franco has set out in his accompanying discussion. In any case, what will become apparent from the entire analysis in this opinion is that both of Franco's contentions are plainly without merit, calling for the summary dismissal of his motion.

### Background

In December 1988 Franco and his codefendant Roberto Garcia ("Garcia," one of Franco's sources of supply for cocaine) went to trial before a jury on a number of drug charges. Both defendants were convicted on all counts in the indictment (Franco on five counts and Garcia on four) on the basis of the facts that have been fairly summarized in the attached "Government's Official Version of the Offense" (Ex. 1 to this opinion), which later formed part of Franco's presentence investigation report ("PSI"). As the jury had obviously done in reaching its guilty verdict as to Franco, this Court independently concluded at trial—and it expressly stated at Franco's later sentencing hearing—that he had committed serious and extended perjury during the course of his trial testimony.

Franco's early 1988 offenses were among the first ones that were made subject to the then-new system of Sentencing Guidelines ("Guidelines"), which took effect as to all criminal offenses committed after November 1, 1987. In March 1989, after this Court had received and reviewed the PSI and had considered the parties' presentations at the sentencing hearing, it imposed a Guidelines sentence on Franco that included 78 months in the custody of the Attorney General—a term that was at the bottom of the Guidelines range of 78 to 97 months.

Still represented by the same retained counsel who had handled his trial, Franco then took an appeal. On August 9, 1990 our Court of Appeals affirmed the convictions of both Franco and Garcia (909 F.2d 1042 (7th Cir.1990)).

### "Sentencing Entrapment"

■ Though Franco has summarized his first ground for relief in the comparatively opaque terms that are set out at the beginning of this opinion, the textual discussion of that ground in his motion makes it clear that he is relying on a doctrine of "sentencing entrapment": the concept that a defendant's rights in the sentencing process are violated by " 'outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities' for the purpose of increasing the amount of drugs ... and the resulting sentence of the entrapped defendant" (*United States v. Rogers*, 982 F.2d 1241, 1245 (8th Cir.1993), quoting *United States v. Lenfesty*, 923 F.2d 1293, 1300 (8th Cir.1991)). According to Franco, the law enforcement agents to whom he was selling cocaine (not knowing of course that they were agents) delayed his arrest until their negotiation of successive cocaine buys had elevated Franco's sentencing range so as to subject him to a longer sentence. And the last step in Franco's argument is that because this Court was unaware of its authority to depart downward based on that conduct, Franco's sentence was therefore imposed as a result of an incorrect application of the Guidelines.[1]

First of all, that same argument could obviously have been made on appeal,[2] so that in this Section 2255 proceeding Franco must demonstrate both (1) cause for his having failed to do so and (2) actual prejudice from the alleged error (see, e.g., *Reed v. United States*, 985 F.2d 880, 882 (7th Cir.1993), recently applying the principle definitively established in *United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982)). For the moment it will be assumed

---

1. Our Court of Appeals has regularly held—as it did on Franco's appeal, 909 F.2d at 1045—that it does have appellate jurisdiction to consider a district court's refusal to depart from the Guide-

lines where the sentence that was actually imposed violated the law, but not otherwise.

2. More on this subject later in n. 3.

arguendo that Franco did in fact suffer from the ineffective assistance of appellate counsel—even though that issue is actually resolved adversely to Franco later in this opinion. Such assumed inadequacy of representation would be enough to satisfy the "cause" component of the analysis. But even on that assumption, Franco must lose on the "actual prejudice" issue.

For one thing, the notion of "sentencing entrapment" has never been recognized by our Court of Appeals. Indeed, the most recent discussion of that concept by the Court of Appeals of the Eighth Circuit in *United States v. Barth,* 990 F.2d 422, 424 (8th 1993) discloses that it is really not yet accepted anywhere—even by that court, which has most often discussed the idea. After quoting its own description of the concept in the *Rogers* case set out earlier in this opinion, *Barth, id.* went on to say:

> Although courts have not generally · adopted the concept of sentencing entrapment, the sentencing guidelines are causing courts nationwide to rethink the long-established rule of entrapment. *See e.g., United States v. Williams,* 954 F.2d 668, 673 (11th Cir.1992) (rejecting the theory of sentence entrapment); *United States v. Connell,* 960 F.2d 191, 196 (1st Cir.1991) (refusing to apply sentencing entrapment). This court has declined "to say there is no such animal as 'sentencing entrapment,'" *Lenfesty,* 923 F.2d at 1300, yet has so far failed to apply sentencing entrapment. In *United States v. Stuart,* 923 F.2d 607, 613–14 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991), this court explained that adopting a sentencing entrapment theory would require us to "abandon [our] long-established rule of entrapment which focuses on the predisposition of the defendant to commit the crime."

True enough, *Barth, id.* at 424–25 went on to confirm that the sentencing entrapment notion "may be legally relied upon to depart under the sentencing guidelines...." However, our own Court of Appeals has been far less generous than most other circuits in upholding departures downward from the Guidelines range, so it is at least open to

serious doubt that the same rule would apply here.

But even on the most favorable premise that the doctrine is at least potentially viable as a ground for a departure from the Guidelines' sentencing range, Franco cannot prevail in this case. Just as Ex. 1 to this opinion accurately reflects, our Court of Appeals said this on Franco's appeal (909 F.2d at 1045):

> Applying the first three factors set forth in [*United States v.*] *Perez-Leon* [757 F.2d 866 (7th Cir.1985) ] [for determining a defendant's predisposition to commit the crime involved] to our facts, we conclude that (1) Franco was a drug addict and seller of small quantities of drugs, but had no prior criminal record; (2) Franco suggested the criminal activity of selling small quantities of cocaine, the government initially suggested the half-kilo sale, and Franco initiated the contacts leading up to the actual half-kilo transaction; and (3) Franco was engaged in the sale of drugs for profit.

Franco contends that he demonstrated substantial reluctance to sell the half-kilo that was overcome only by repeated government inducement. We disagree. Franco at first could only sell smaller quantities because his source's profit was greater with more frequent sales of smaller quantities. Franco therefore could not obtain more than a few ounces. This is not reluctance; this is inability, and it says nothing about whether Franco was predisposed to commit the crime for which he was convicted.

Prior to every transaction, Franco initiated contact with Colletti by calling her or paging her through her beeper. When Colletti first inquired about larger quantities, Franco told her "maybe later," and said he would discuss obtaining larger quantities with his source. Later Franco assured Colletti that his source was able to provide kilogram quantities of cocaine. His initial inability to sell larger quantities was overcome by his frequent later attempts to set up a large-quantity sale with Colletti. Eventually he succeeded.[3]

**3.** [Footnote by this Court] It is worth noting that

this quotation from our Court of Appeals' opin-

Indeed, at the very end of his dealings with the agents Franco actually disclosed that he would be able to provide the half kilogram of cocaine from not just one but from *two* separate sources.

■ Thus Franco clearly was not someone who was dragged reluctantly into the business of dealing in cocaine or—most importantly for purposes of his present argument—of dealing in the larger half-kilo quantity that was involved in the ultimate transaction that led to his arrest. Moreover, it should also be added that nothing adduced in the trial or now advanced by Franco has suggested that the agents' decision not to move in on Franco and Garcia earlier was the type of "outrageous conduct" that has been spoken of in the Eighth Circuit decisions. Instead what the facts disclosed was the type of reasonable law enforcement decision that does not in any way imply a motive on the agents' part to up the stakes for sentencing purposes.

What has been said to this point is enough to defeat Franco's first contention. But it should be added that Franco is also wrong in characterizing this Court as being unaware of its ability to depart downward *if* that had been appropriate.[4] Although Franco's sentencing came in the early days of the Guidelines regime, this Court's statement to him in the course of imposing sentence was both an accurate reflection of the Guidelines themselves and an accurate prediction of the substantial constraints on departures downward that have since been developed by our Court of Appeals (Tr. 46, emphasis added):

> *And unless it is possible to meet some very difficult standards,* it is unlawful for a Judge to go outside of these guidelines,

either to impose an easier sentence or to impose a harder sentence.

Most importantly, in this Court's view all of the factors that bore on the choice of an appropriate sentence for Franco—his obvious familiarity with and ability to engage in substantial cocaine distribution, his perjurious testimony at the trial and the other matters accurately set out in Ex. 1—would not have justified or led to a departure downward. So from that perspective too Franco has failed to show actual prejudice.

*Ineffective Assistance of Counsel*

As Franco's current submission on his second ground for relief acknowledges, the test for ineffective assistance of counsel is that defined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Just a week ago our Court of Appeals recapitulated *Strickland*'s teaching in these terms (*United States v. Penass,* 997 F.2d 1227, at 1229 (7th Cir.1993) (citations omitted)):

> To establish ineffective assistance, [defendant] must first identify specific acts or omissions of his counsel that demonstrate his attorney's performance fell below an objective standard of reasonableness. Assuming that the representation does not come within the admittedly wide range of legal assistance regarded as professionally competent, [defendant] must also establish prejudice, or that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. A reasonable probability of a different result means one sufficient to undermine confidence in the outcome.

ion indicates that on his direct appeal Franco *did* make essentially the same argument as his current "sentencing entrapment" contention, though it was clothed in slightly different garb. What he argued at the time of his appeal, just as he argues now, was that he was *not* predisposed to sell large quantities of cocaine and was entrapped into doing so. For that reason he appealed only the counts involving the half-kilo transaction, seeking a remand for resentencing (909 F.2d at 1044). That is really quite close to his current position—but this opinion will proceed on the premise that he is not foreclosed from advancing the argument now just because

he was unsuccessful in putting the matter before the Court of Appeals.

4. On that issue, of course, Franco has no difficulty in satisfying the "cause" branch of the *Frady* analysis. On his appeal he did argue that this Court has "erred by failing to depart downward from his guideline sentence because of the mitigating factor that Franco was initially reluctant to sell larger amounts" (909 F.2d at 1045). That contention was rejected by our Court of Appeals on jurisdictional grounds and not on the merits.

In this instance Franco fails on both branches of the *Strickland* test. As already pointed out, his appellate counsel *did* argue entrapment vigorously before the Court of Appeals, seeking relief under the principles established by law for that doctrine. At the trial level, the same able counsel had urged the same contention. Any notion that Franco's counsel was somehow professionally incompetent—constitutionally deficient—in failing to raise the argument of "sentencing entrapment" at either the trial or appellate level—an argument that has not yet found its way into the jurisprudence of this circuit—is patently untenable. And the same factors that have led this opinion to hold that no actual prejudice has been shown as to Franco's first ground for relief also compel the conclusion that there was no arguable prejudice attributable to counsel's not having raised that argument before this Court in the first instance—an argument that was doomed to fail *on the merits* of seeking a downward departure.

### Conclusion

Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts calls for this Court to give prompt initial consideration to a newly-filed Section 2255 motion. That Rule goes on to say:

> If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

That fits Franco's current motion exactly: It is exceedingly plain that he is not entitled to any relief here. Accordingly his Rule 2255 motion is dismissed summarily.

### EXHIBIT 1

I. *Government's "Official Version of the Offense"*

From April through June of 1988, defendants Franco and Garcia conspired to possess with intent to distribute and distribute varying amounts of cocaine. On April 18, 1988, Special Agent Nancy Colletti of the Drug Enforcement Administration (DEA) was introduced to Ruben Franco for the first time at La Cocinita Restaurant, located at 3961 N. Ashland Avenue in Chicago. Agent Colletti asked Franco if he could sell her two ounces of cocaine; Franco advised Colletti that he would have to first page his source. Franco then left and paged defendant Garcia. They made arrangements to meet shortly thereafter at a Burger King restaurant located at Lawrence and Western Avenues. Agent Colletti then travelled with Franco to the Burger King. Garcia arrived shortly thereafter; at that time, Franco left agent Colletti and met with Garcia in his car. Garcia gave the two ounces of cocaine to Franco who then returned to agent Colletti's car and delivered the cocaine to her for the prearranged price of $1900. After receiving the payment, Franco returned to Garcia's car where the defendants split the proceeds of the cocaine distribution (Franco testified at trial that he retained $100 and gave the remaining $1800 to his source (Garcia)).

On April 27, 1988 agent Colletti and Special Agent Frank Guerra of the Illinois State Police met with Franco at La Cocinita restaurant. Prior to this meeting, Franco and agent Colletti had a series of telephone conversations during which Franco agreed to sell agent Colletti one ounce of cocaine for $950. After meeting with Colletti and Guerra, Franco immediately contacted Garcia to make arrangements to deliver the cocaine. The defendants agreed to again meet at the Burger King restaurant located at Lawrence and Western. Franco travelled with agents Colletti and Guerra to the Burger King. In route to the Burger King, Franco advised agent Guerra that his source (Garcia) could sell kilogram quantities of cocaine, but that Franco had never personally sold more than four ounces of cocaine at any one time. Franco also told the agents that Garcia would not agree to meet with them.

After arriving at the Burger King, Franco left the agents and, after waiting a few minutes, met with Garcia in his car. Garcia again handed Franco the ounce of cocaine which Franco then delivered to the agents for $950. Before leaving, Franco agreed to speak with his source (Garcia) about prospec-

tive sales of kilogram quantities of cocaine. Franco then left the agent's vehicle and returned to Garcia's car where the defendants again shared in the proceeds of the cocaine sale (Franco testified that he kept $50 and provided the remaining $900 to his source (Garcia)).

In the weeks following this second purchase, agent Colletti engaged in numerous telephone conversations with Ruben Franco. In substance, Colletti repeatedly asked Franco if his source was willing to supply kilogram quantities of cocaine; Franco regularly advised agent Colletti that he would have to speak with his source. Franco advised Agent Colletti that his source was unwilling to sell her larger quantities of cocaine at that time, but might be willing to do so some three to four weeks later. In the meantime, Franco repeatedly contacted Agent Colletti and asked if she was interested in purchasing ounce quantities of cocaine. In early June, Colletti agreed to purchase an additional two ounces of cocaine from Franco.

The third cocaine distribution took place on June 14, 1988. On that date, Franco contacted agent Colletti and advised her that his source (Garcia) had two ounces of cocaine available for sale that day. Franco told Colletti to meet him at the same Burger King restaurant at 6:00 p.m. that evening. Before Agent Colletti arrived at the Burger King, Franco and Garcia met in front of the restaurant. Garcia advised Franco that two women would soon be arriving in a particular vehicle (a green Buick) with the cocaine. Agent Colletti arrived as Franco was speaking with Garcia; Franco left Garcia and entered Agent Colletti's car. He told her that he did not yet have the cocaine. Garcia left Franco and crossed the street, watching for the arrival of the green Buick. When Garcia saw the vehicle he signalled to its two occupants and directed them to pull into the Burger King parking lot. The Buick was driven by Garcia's wife; the passenger was the Garcias' roommate, Bertha Juarbe. As the Buick entered the Burger King parking lot, Franco left agent Colletti, walked over to and entered the Buick. Juarbe handed Franco the two ounces of cocaine; Franco then returned to Agent Colletti's car where he delivered the cocaine to her in exchange for $1800. After Franco delivered the cocaine, he advised agent Colletti that his source (Garcia) had agreed to sell her a pound of cocaine for $15,000. Colletti told Franco that she would not pay that much for a pound of cocaine but would agree to pay as much as $13,000 for a half-kilogram of high-quality cocaine. Franco told Agent Colletti that he would discuss her offer with his source (Garcia) and contact her in the near future. Franco then left Agent Colletti's car and re-entered the green Buick. Moments later, Garcia crossed the street and also entered the Buick, where the defendants again divided the proceeds of the cocaine sale. Franco testified that he retained $100 and gave the remaining $1700 to his source (Garcia).

Over the next several days, Franco and agent Colletti had numerous telephone conversations to negotiate the sale of one-half kilogram of cocaine. In separate recorded conversations on June 17 and June 21, Franco advised agent Colletti that his source (Garcia) had agreed to sell her one-half kilogram for $13,000. On June 22, Franco advised Colletti that he had *two* potential sources for the half-kilogram; one source (Garcia), who had agreed to sell it for $12,000, did not have the half-kilogram available at that time; a second source, who *did* have the half-kilogram, was asking $14,000. Colletti told Franco later that evening that she was unwilling to pay any more than $13,000 for the half-kilogram. On the following evening, June 23, Franco called Agent Colletti to advise her that his source would be able to sell her one-half kilogram of cocaine for $13,000 on the following day (June 24). In response to Colletti's question, Franco specifically stated that his source for the half-kilogram would be the same individual that had supplied him with the cocaine for the previous transaction (Garcia).

The following day, June 24, 1988, Franco met with agent Colletti at the Burger King restaurant and delivered to her the one-half kilogram of cocaine. Franco was arrested before he was paid for the cocaine. The

government does not contend that the seized cocaine was supplied to Franco by Garcia.

Norberto Garcia was interviewed by Federal agents following Ruben Franco's arrest. During that interview, Garcia falsely advised the agents that he did not know Ruben Franco and had never participated with Franco in the distribution of narcotics.

Ruben Franco elected to testify on his own behalf at trial, and claimed that he was entrapped by agent Colletti into each of the above-summarized transactions. He testified that he had been addicted to cocaine for several years before he met agent Colletti. He claimed that, despite his addiction, he had *never* sold or distributed cocaine prior to meeting agent Colletti. He asserted that he obtained his daily supply of cocaine from many individuals who regularly *gave* him the drug at no charge; he also testified that on one occasion he stole money from his father's restaurant in order to purchase cocaine. Franco claimed that he agreed to sell agent Colletti cocaine because he felt sorry for her—he said that he believed that she was suffering from hunger and needed the cocaine to raise money in order to feed herself. He claimed that he was reluctant to sell her *any* amounts of cocaine and only agreed to do so after incessant "begging".

The above-summarized testimony was not only inconsistent with virtually every other piece of evidence presented at trial but also was utterly belied by Franco's own conduct and tape-recorded statements made during the course of the conspiracy. Franco was able to locate his source and arrange for a two-ounce cocaine transaction within *minutes* of his first meeting agent Colletti. In tape recorded conversations, Franco repeatedly referred to *prior* drug distributions that he had engaged in and also made clear his long-standing relationship and familiarity with his cocaine source's (Garcia's) methods of operation.

The jury's verdict leaves no doubt that the jury rejected Franco's testimony. In the government's view, Franco's trial testimony was blatantly perjurious and deserves to be punished separate and apart from the underlying narcotics offenses.

In addition to the above-summarized perjurious testimony, Garcia was unable at trial to recall several material events that he had described to the government no less than 10 days before the trial began. For example, Franco testified at trial that he could not recall the identity of the woman who drove the green Buick on the third transaction; 10 days earlier Franco advised the government that the driver was his co-defendant's wife, Mirna Garcia. At trial, Franco also testified that he was unable to remember if he had used the same source for the first three cocaine transactions; 10 days earlier he had little difficulty advising the government that Garcia was his source for each of the first three transactions. These represent but a few of the material "memory lapses" suffered by Franco while testifying at trial; the government similarly regards this aspect of Franco's testimony as perjurious and deserving of punishment.