UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph J. REED, Defendant–Appellant.

No. 96–4174.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1998.

Decided April 15, 1998.

Samuel H. Shamansky (argued and briefed), Columbus, OH, for Defendant–Appellant.

Nancy A. Vecchiarelli, Asst. U.S. Attorney (argued and briefed), Cleveland, OH, for Plaintiff–Appellee.

Before: WELLFORD, RYAN, and SILER, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which SILER, J., joined. WELLFORD, J. (p. 653), delivered a separate opinion concurring in the result.

RYAN, Circuit Judge.

The defendant, Joseph J. Reed, appeals his conviction on jury verdicts finding him guilty of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1); he also appeals his sentence, which was increased to the mandatory mini-. mum pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851(a)(1). Reed presses three issues on appeal: (1) whether the district court erred in denying Reed's motion to suppress contraband allegedly obtained in violation of the Fourth Amendment; (2) whether there was sufficient evidence to support Reed's convictions; and (3) whether the time-bar provision of 21 U.S.C. § 851(e) is constitutional. We affirm the convictions and sentence.

I.

Reed was charged, pursuant to a two-count indictment, with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), and with possessing with intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1). Reed filed a motion to suppress evidence. After hearing four days of evidence and argument, the trial court denied the motion. Upon reconsideration, the trial court let the denial stand after finding the defendant's new evidence of an alleged police conspiracy to be incredible. Following a three-day jury trial, Reed was found guilty on both counts.

These facts were adduced at the suppression hearings: one evening in November 1995, Megan Collins, a resident of the upper flat of a double house in Mansfield, Ohio, heard a thump and the alarm go off in the lower flat of the house. The alarm stopped sounding about 20 minutes later. After approximately 10 more minutes, Megan heard another thump, glass breaking, and the alarm again sounding. Her mother, Soni Collins, then called 911 at 7:26 p.m. to report the disturbance. Minutes later, at about 7:30 p.m., four patrolmen arrived near-simultaneously. While securing the rear of the premises, Mansfield Police Officers Brett Snavely and Shari Robertson found a broken window and a door ajar. On-scene commander, Sergeant Michelle Webb, then decided to call in a canine team. Mansfield's policy is to use canines to sweep a building for any trapped intruders, if feasible, in order to reduce the risk to officers.

At 7:41 p.m., Reed arrived, and declared that he lived in the bottom flat. Snavely explained the situation to Reed, who replied that the unit had been broken into several times, hence the alarm; that he thought it was a good idea to send in a dog; and that he hoped the dog found the burglar. At 7:50 p.m., Richland County Deputy Sheriff James

Sweat arrived with his dog, "Cheddy." Snavely then asked Reed for a key to the front door to allow the canine unit to enter the building, avoiding the broken glass near the back door. Reed said "sure," and handed Snavely the key. Sweat then shouted the standard 30– and 15–second warnings that he was going to release his dog if whomever was inside did not surrender. Next, Sweat loosed Cheddy and ordered the dog to "find them," which, in conjunction with the 30– and 15–second warnings, is the dog's signal to search out intruders as opposed to drugs. Cheddy entered the lower flat, followed by Sweat, who waited at the door while the dog "cleared" the first room. Each room was sequentially investigated in this same fashion.

Unbeknownst to Reed, Cheddy was also trained to search for drugs, albeit in response to the unique command "get the dope," and in conjunction with a substantially different "leashing" procedure designed to protect the dog from ingesting drugs. Although Cheddy was not ordered to search for drugs, and although he was not leashed, he alerted for drugs in several areas during the search. According to Sweat, an award-winning police canine handler, judge, and certifier, this was a first for the award-winning Cheddy.

Cheddy's conditioned response to an intruder is to bark. In contrast, the dog is trained, when alerting on drugs, to scratch, dig, or bite at the object containing the drugs until Sweat pulls him off. Cheddy first scratched at the livingroom couch indicating drugs, but Sweat called him off thinking the alert was to human scent coming from the basement through a nearby heating duct. Thus, Sweat again ordered Cheddy to "find them." In due course, Cheddy entered the master bedroom, and alerted on a dresser by scratching at the right-hand dresser drawers. Sweat, upon hearing the commotion, entered the master bedroom. Although it is unknown whether the dresser drawers were open before Cheddy entered the room, apparently the dog had knocked the top drawer off its runners and into the second drawer, which was also open. To protect Cheddy, whose head was in the top drawer, Sweat pulled the dog away, and noticed a bag of cocaine plainly visible in his bright mag-light beam. Sweat and Cheddy continued the intruder search in the bathroom, which was the last room to be searched. Sweat did not search the basement because it was padlocked from the inside. Sweat then returned to the master bedroom to partially replace the dresser drawers before exiting the flat. He then gave an all-clear-of-suspects report. Sweat and the dog had been inside the flat for approximately five minutes.

Next, Snavely took Reed inside the flat to determine whether anything had been stolen by the suspected intruder. Reed first turned the alarm off, and then proceeded directly to examine the dresser in the master bedroom. During the ensuing inspection of the flat, Snavely noticed a box for a triple-beam Ohaus scale in the spare bedroom, and cigarette rolling papers on a table near the couch. Officer Robertson, who was preparing the burglary report, also noticed the scale box and the cigarette papers. Sweat, too, had noticed the rolling papers, as well as a box for a digital scale, when he and Cheddy first cleared the rooms.

After securing Cheddy, Sweat advised Snavely of the events in the master bedroom. Snavely returned to the dresser and could plainly see the baggie in the top drawer, which was still open approximately one-and-a-half inches. To confirm his suspicions that the baggie contained contraband, Snavely inched open the drawer a bit further. Members of the drug task force, called "MetRich," were then summoned to the scene. In addition, although Reed had earlier stated at least twice that he lived in the lower flat, Snavely again asked Reed whether he lived there. Reed replied that he lived in the flat alone. Snavely informed Reed about the drugs that were found, placed him under arrest, and escorted him to jail. Before Snavely and Reed departed, MetRich officers arrived and asked Reed for his consent to search the flat. After conferring with his lawyer over the phone, Reed denied the request.

While Robertson and MetRich members left to obtain a search warrant, other officers guarded the house. As Robertson was

preparing the affidavit, one of the MetRich officers discovered that Reed had a prior conviction for drug trafficking and that a "concerned citizen" had complained of his trafficking activities. This information was included in the affidavit. The affidavit also included a recitation of Cheddy's various drug and utility certifications. Although the dog's qualifications were correctly stated, his name was mistakenly listed as "Speedy." After the judge signed the search warrant, Sweat and Cheddy were recalled to the scene in order to conduct a full-scale drug sweep.

The officers first secured the drugs, 23.47 grams of crack, previously seen in the top right-hand dresser drawer, and then Sweat began a narcotics search with Cheddy on a leash. The following items were seized: from the top left dresser drawer, 53.06 grams of crack and 3.807 grams of marijuana; from underneath the couch cushion, .24 grams of crack, which was laying next to an Ohio-manufactured pistol that contained ammunition manufactured out-of-state; from a box underneath the couch, an Intratec pistol containing four CCI-brand rounds of ammunition; from the coffee table top, some rolling papers; and from under the bathroom sink, an Ohaus triple-beam scale, and a bottle of Inositol, a drug-cutting agent.

## II.

In denying Reed's motion to suppress this evidence, the court found (1) that officers were properly on the premises either by consent, or because they entered in search of a burglar; (2) that Sweat did not open the drawers to allow the initial plain-view discovery; and (3) that officers did not conspire to search Reed's residence.

The trial court granted Reed's motion to reconsider the denial of the motion to suppress. Reed produced a witness, Reginald Bonner, who testified that an unknown plainclothed police officer offered to drop charges against Bonner if Bonner "snitched on somebody." Bonner related that he "ratted out" Reed; that the same officer then took Bonner from his jail cell to Reed's flat; that Bonner broke the glass at Reed's flat, entered the flat for a time, returned to the

officer's car parked three minutes away, walked back to the flat, spent four to five minutes inside, found the cocaine in the right-hand dresser drawer, and returned to the officer's car; and that he was returned to his cell. There was no booking card to substantiate Bonner's arrest, or the charges against him. Neither could he identify the police officer he claimed solicited his services. The trial court found Bonner's testimony incredible because his testimony placed him in the flat for some 15 minutes beginning with the first breaking of the glass and ending with his second exiting, yet the 911 records showed that officers were on the scene approximately three minutes after the glass was broken. The court let stand its prior denial of the motion to suppress. The court summarized the suppression hearings, and resulting oral rulings, in an opinion and order, in which, based on recent case law, the court included an additional finding that the "government [had] clearly established the extensive training and reliability of the dog used to search [Reed's] apartment."

## III.

### A. Motion to Suppress

"When reviewing the denial of a motion to suppress evidence, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Jenkins*, 124 F.3d 768, 771–72 (6th Cir.1997) (citing *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.1992)). "We must review the evidence in the light most likely to support the district court's decision." *Id.* at 772 (internal quotation marks and citations omitted).

Reed does not dispute the district court's factual findings; rather, he argues that when the dog allegedly opened the dresser drawers, the scope of Reed's consent to search for intruders was exceeded, in violation of the Fourth Amendment. It is axiomatic that the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy," *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977), and that absent some exception, po-

lice may not conduct a warrantless search of an individual's home, *see United States v. Johnson*, 9 F.3d 506, 508 (6th Cir.1993). One exception allows police to enter a residence without a warrant if there is probable cause to believe that there is a burglary in progress. *See id.* at 509–10. Another exception, of course, is a consensual search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). Both of these exceptions are circumscribed, however, by the object of the search—here, to find a suspected intruder. *See Florida v. Jimeno*, 500 U.S. 248, 251–52, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991); *Johnson*, 9 F.3d at 510.

▆▆▆▆ Nonetheless, "[w]here the initial intrusion that brings the police within plain view of . . . an [incriminating] article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Horton v. California*, 496 U.S. 128, 135, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990). Thus, an officer (1) who is lawfully at a vantage point; (2) who observes obviously incriminating evidence in plain view; and (3) who has lawful access to the contraband, may seize the evidence without offending the Fourth Amendment. *See id.* at 135–37, 110 S.Ct. at 2307–08; *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 324, 139 L.Ed.2d 250 (1997). Such a plain viewing and seizure, even if accomplished with the aid of a flashlight, *see United States v. Dunn*, 480 U.S. 294, 305, 107 S.Ct. 1134, 1141–42, 94 L.Ed.2d 326 (1987), does not exceed the scope of a search pursuant to either of the above warrant exceptions. If, however, the incriminating nature of the evidence is not immediately apparent, then the plain-view doctrine would not support the seizure. *Arizona v. Hicks*, 480 U.S. 321, 323–24, 107 S.Ct. 1149, 1151–52, 94 L.Ed.2d 347 (1987). But, if an article of obvious contraband "is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton*, 496 U.S. at 133, 110 S.Ct. at 2306.

The Supreme Court has held that a "canine sniff" does not unreasonably intrude upon a person's reasonable expectation of privacy. *See United States v. Place*, 462 U.S. 696, 706–07, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983). This is so, because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item." *Id.* at 707, 103 S.Ct. at 2644; *see United States v. Jacobsen*, 466 U.S. 109, 123–24, 104 S.Ct. 1652, 1661–62, 80 L.Ed.2d 85 (1984). Therefore, the limited and discriminating nature of a sniff does "not constitute a 'search' within the meaning of the Fourth Amendment." *Place*, 462 U.S. at 707, 103 S.Ct. at 2645.

▆▆▆▆ Just as the sniffing of contraband by trained canines does not constitute an unlawful search, neither does the viewing by humans of contraband in plain sight amount to an unlawful search. As long as the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred. In addition, just as contraband in plain view may be seized if legally accessed and may also provide probable cause to obtain a search warrant, so, too, "[a] positive reaction by a properly trained narcotics dog can establish probable cause for the presence of controlled substances." *United States v. Berry*, 90 F.3d 148, 153 (6th Cir.) (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994)), *cert. denied*, —— U.S. ——, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996).

Reed acknowledges that if Sweat, while searching for an intruder, entered the room before Cheddy and saw the drugs lying in an open dresser drawer, the discovery would have fallen within the plain-view doctrine. However, Reed contends if Cheddy moved the drawers, the result is that Sweat's discovery was outside the plain-view doctrine. Essential to Reed's argument, is his contention that *Place*, which held that a sniff is not a search, applies only to "public sniffs." Reed relies on *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), to support his argument.

*Thomas* seems to stand alone in its pronouncement that a canine sniff may consti-

tute an unreasonable search. According to the *Thomas* court, the heightened privacy interest in a dwelling place renders a canine sniff intrusive on the inhabitant's expectation of privacy, even with respect to contraband. *Id.* at 1366–67. Yet, this holding ignores the Supreme Court's determination in *Place* that a person has no legitimate privacy interest in the possession of contraband, thus rendering the location of the contraband irrelevant to the Court's holding that a canine sniff does not constitute a search. Indeed, the Court later explained that "the *reason* [the *Place* canine sniff] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items." *Jacobsen,* 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24. In short, there is no legitimate interest in "privately" possessing cocaine. *Id.* at 123, 104 S.Ct. at 1661–62.

■ At least two circuits have rejected the *Thomas* court's holding because it conflicts with the Supreme Court's determination that "[n]o legitimate expectation of privacy is impinged by governmental conduct that can 'reveal nothing about noncontraband items.' " *United States v. Colyer,* 878 F.2d 469, 475 (D.C.Cir.1989) (quoting *Jacobsen,* 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24); *see United States v. Lingenfelter,* 997 F.2d 632, 638 (9th Cir.1993) (quoting *Colyer,* 878 F.2d at 475). Additionally, this circuit has criticized *Thomas* for rejecting the notion that a canine sniff is not a search within the meaning of the Fourth Amendment no matter where the sniff takes place. *See United States v. Cook,* No. 89–5947, 1990 WL 70703, at *3–5 (6th Cir. May 29, 1990) (Guy, J., concurring). We now take the opportunity to clarify that a canine sniff is not a search within the meaning of the Fourth Amendment. Of course, the canine team must lawfully be present at the location where the sniff occurs. *See Diaz,* 25 F.3d at 397.

■ Here, the canine team was lawfully present in Reed's flat, either due to the pursuit of a burglar, or Reed's consent. Any contraband seen by Sweat, or sniffed by Cheddy, therefore, fell within the "plainview" doctrine or the "canine-sniff" rule. Thus, there was no illegal search in this instance, even assuming that Cheddy moved the drawers, which has not been established. This is so because the movement of the drawers, if any, would have been occasioned by Cheddy's instinctive reactions to the nature of the contraband. Indeed, at least two circuits have found that, absent police misconduct, the instinctive acts of trained canines, such as trying to open a container containing narcotics, does not violate the Fourth Amendment. *See United States v. Lyons,* 957 F.2d 615, 617 (8th Cir.1992); *United States v. Stone,* 866 F.2d 359, 364 (10th Cir.1989). Moreover, the alert itself provided sufficient probable cause for the warrant to issue, such that Sweat's observation was not critical in any event. In fact, the initial alert on the couch, which involved no opening of closed containers, provided probable cause once Sweat realized that no human scent was coming from the locked basement.

In *Hicks,* the Court held that if an officer had to move an item in order to discover its nature as contraband, seizure under the plain-view exception was not justified. *See* 480 U.S. at 324–25, 107 S.Ct. at 1152–53. Here, Cheddy's alert on the couch, and his alert on the dresser, occurred without any interference with Reed's possessory interest in the contraband, both because no movement was necessary, and because there is no possessory interest in contraband. In addition, Sweat concededly did not move anything when he observed the immediately incriminating appearance of the baggie, and if Cheddy instinctively aided Sweat's observation, there was no violation of the Fourth Amendment.

### B. Sufficiency of the Evidence

■ Reed claims there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he actually or constructively "possessed" the contraband. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99

S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see Calloway,* 116 F.3d at 1134. Circumstantial evidence is sufficient alone to sustain a jury's verdict. *See United States v. Lee,* 991 F.2d 343, 348 (6th Cir.1993).

▮▮▮▮ Constructive possession exists when a person knowingly has " 'the power and intention at a given time to exercise dominion and control over an object' " not in his or her actual possession. *United States v. Murphy,* 107 F.3d 1199, 1208 (6th Cir. 1997) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.1973)). Like actual possession, constructive possession may be proved by circumstantial evidence. *See id.*

Here, the jury heard how the officers were summoned to the lower flat, how quickly they arrived on the scene, how they secured the flat when they arrived, how they contacted the canine unit, how Reed proceeded directly to the dresser upon entering the flat, how Reed was arrested, how the search warrant was obtained, and how particular evidence was obtained pursuant to the search warrant. The jury also examined photographs of the drugs in the dresser drawer and under the couch cushion, and heard that Reed's fingerprints were not found on the dresser nor on any of the seized items. However, Bonner's conspiracy testimony from the suppression hearing was not repeated for the jury.

There is ample evidence to prove that Reed had the power to exercise dominion over the contraband. He admitted that the drugs were found in his flat, and that he lived there alone. This is enough evidence to prove his constructive possession. Moreover, he does not argue that the contraband belonged to an acquaintance who might have stored it in Reed's flat; rather, he suggests that the intruder could have hidden contraband in his flat.

▮▮▮▮ Unfortunately for Reed, the evidence belies any suggestion that an intruder hid the contraband in Reed's flat. Law-enforcement officers arrived on the scene of a burglary in progress, and secured the premises within minutes after the glass was broken. There was no evidence of entry prior to the breaking glass. Therefore, the intruder would have had approximately three minutes to secrete the contraband and depart. Given the wide dispersion and degree of concealment of the contraband, the large quantity and value of the drugs involved, and the other evidence of drug distribution, a rational jury could have found that the contraband indeed belonged to Reed, and that three minutes was not enough time to "plant" this vast array. In any event, in proving constructive possession, it is not necessary that every reasonable hypothesis except that of guilt be removed. *See Craven,* 478 F.2d at 1333. Sufficient evidence existed to allow a rational trier of fact to reasonably find that Reed constructively possessed the contraband found in the flat that he alone inhabited.

## C. Constitutionality

Reed also challenges his sentence. The government filed an Information Regarding Prior Convictions, pursuant to 21 U.S.C. § 851(a)(1), notifying Reed that if convicted of the drug count, his sentence would be increased pursuant to 21 U.S.C. § 841(b)(1)(A) because of a 1991 drug-trafficking conviction in state court. Reed responded that the state-court conviction was unconstitutional, and could not be used to increase his sentence beyond the United States Sentencing Guidelines sentencing range of 188–235 months. However, he did not directly challenge, in his response or at the sentencing, the constitutionality of section 851 itself. The trial court found Reed's challenge to the state conviction time-barred pursuant to 21 U.S.C. § 851(e), and, accordingly sentenced Reed to the statutory mandatory minimum of 240 months' incarceration. Reed now argues, for the first time, that the time bar is unconstitutional.

▮▮▮▮ Challenges to the constitutionality of a criminal statute are reviewed *de novo. See United States v. Brown,* 25 F.3d 307, 308 (6th Cir.1994). Generally, a failure to raise an issue below precludes this court's consideration of the issue on appeal; "[h]owever, [this court] may exercise [its] discretion to review an issue not raised below in exceptional cases ... or when the rule would produce a plain miscarriage of justice." *United States v. Chesney,* 86 F.3d 564, 567–

68 (6th Cir.1996) (internal quotation marks and citations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 2470, 138 L.Ed.2d 225 (1997).

Although no exceptional circumstances compel review here, Reed urges this court to exercise its discretion and find 21 U.S.C. § 851(e) unconstitutional. The indictment charged Reed with violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). The latter subsection provides: "If any person commits [a violation of subsection (a) ] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years...." 21 U.S.C. § 841(b)(1)(A). Here, the government properly established the prior conviction by filing with the court, and the defendant before trial, an information detailing the prior state conviction. *See* 21 U.S.C. § 851(a)(1). The statute provides that a defendant may deny the prior conviction before being sentenced, *see* 21 U.S.C. § 851(b), or may challenge the conviction in writing subject to a preponderance standard, *see* 21 U.S.C. § 851(c). However, the statute also provides that no defendant "may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." 21 U.S.C. § 851(e). Reed challenges this last provision.

Reed, while acknowledging that the prior conviction is within the time bar of section 851(c), argues that the statutory time bar is unconstitutional, both facially and as applied to him, because it makes an arbitrary distinction between similarly situated defendants, in violation of the Fifth Amendment's Due Process and Equal Protection Clauses. *See Chapman v. United States,* 500 U.S. 453, 465, 111 S.Ct. 1919, 1927–28, 114 L.Ed.2d 524 (1991). Reed also asserts that the time bar deprives him of his liberty interest in having only a valid prior conviction enhance his sentence, and that the time bar violates *Custis v. United States,* 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). Reed's arguments are not well taken.

While no court has sustained a constitutional challenge to 21 U.S.C. § 851(e), at least five circuits have found the provision constitutional on both due process and equal protection grounds. *See United States v. Prior,* 107 F.3d 654, 660–61 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 84, 139 L.Ed.2d 41 (1997); *United States v. Gonzales,* 79 F.3d 413, 426–27 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Arango–Montoya,* 61 F.3d 1331, 1338 (7th Cir. 1995); *United States v. McChristian,* 47 F.3d 1499, 1503 (9th Cir.1995); and *United States v. Williams,* 954 F.2d 668, 673 (11th Cir. 1992). In addition, this court, though not squarely presented with a constitutional challenge to the time bar, approvingly noted in upholding the time-barring of a defendant's objections to his enhanced sentence, that section 851(e) had been held constitutional. *See United States v. Jenkins,* 4 F.3d 1338, 1343 (6th Cir.1993).

We reject Reed's arguments, and we find no other compelling reason to hold that the statute is unconstitutional. In fact, the Supreme Court has made it clear that Congress could choose to eliminate all collateral attacks on prior convictions with regard to sentence enhancement, save for the limited circumstance in which the prior conviction was obtained in violation of the right to have counsel appointed. *See Custis,* 511 U.S. at 491–97, 114 S.Ct. at 1736–39. In other words, a defendant may collaterally attack a prior conviction used for purposes of sentence enhancement only if (1) such attack is provided by statute, or (2) such attack is a constitutional one premised on a lack of counsel. *See Gonzales,* 79 F.3d at 426–27 (citing *Custis,* 511 U.S. at 493–97, 114 S.Ct. at 1736–39).

Here, Reed was fully represented by counsel during the 1991 state court guilty plea and sentencing; therefore, he must rely on the statutory provision to attack the prior sentence. We hold, as our sister circuits have, that Congress reasonably circumscribed the statutorily created right found in section 851. Furthermore, section 851 "is a reasonable limitation on defendants to effectuate the purposes of sentence enhancement for recidivists and to eliminate a host of problems with respect to ancient or destroyed records." *Gonzales,* 79 F.3d at 426. Therefore, because Reed did not challenge

the 1991 sentence within the five-year statutory period, the district court did not err in dismissing his challenge as time-barred.

### IV.

Accordingly, we **AFFIRM** in all respects.

WELLFORD, Circuit Judge, concurring.

I concur in the result reached in this case, but I write separately to clarify my views on the Fourth Amendment issues raised in this appeal.

I would not conclude, as the majority does, that a canine sniff is never a Fourth Amendment search. I agree with the rationale of *United States v. Thomas*, 757 F.2d 1359, 1366–67 (2d Cir.1985), which distinguishes between a canine sniff at a public airport, *see United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and one that takes place in a private home. The former does not constitute a Fourth Amendment search because it does not intrude upon a legitimate expectation of privacy, but the latter may under some circumstances because of the heightened privacy expectations in a private home. *Thomas*, 757 F.2d at 1366–7. *See also Place*, 462 U.S. at 707, 103 S.Ct. at 2644–45 (concluding "that *the particular course of investigation that the agents intended to pursue here*—exposure of [Place's] luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment") (emphasis added).

The two cases which the majority identifies as criticizing the *Thomas* decision are easily distinguishable from the instant case. The *Colyer* case involved a trained canine sniff of "the exterior of an Amtrak roomette," an intrusion on privacy far different, in my view, from a search of dresser drawers in one's apartment. *United States v. Colyer*, 878 F.2d 469, 473 (D.C.Cir.1989). The Ninth Circuit's *Lingenfelter* decision is similarly inapposite. That case involved a trained canine search of a warehouse, and the court criticized *Thomas* in dicta only after holding that the defendants challenging the police action lacked standing. *United States v. Lingenfelter*, 997 F.2d 632, 636–8 (9th Cir.1993). This case differs from *Colyer* and *Lingenfelter* both because of the heightened privacy interest in one's home and because Reed consented only

to a search for a suspected intruder in his residence, and not to a search of his private belongings for contraband. Under these circumstances, I believe the actions of Cheddy, the trained canine, may have constituted a Fourth Amendment search.

Even so, I would agree that the canine team was lawfully in Reed's apartment, and I note that the police in this case did not handle Cheddy improperly. Furthermore, I agree that any contraband seen by the human officer or sniffed by the trained canine fell within either the "plain view" doctrine or Judge Ryan's "canine sniff" rule. Moreover, there was other evidence observed by the police, including Cheddy's alert on the sofa in the living room, to indicate probable cause to believe that contraband was located in Reed's apartment even without considering the contents of Reed's dresser drawers. The officers properly obtained a warrant before making a full-scale drug sweep. The police, in short, did not overreach, nor did they intentionally violate Reed's constitutional rights.

I would, accordingly, **AFFIRM** the district court's decision in all respects, and I concur in my colleague's analysis as to all but that portion of Section III.A. holding that a canine sniff can never be a Fourth Amendment search.