**UNITED STATES of America,
Plaintiff,**

v.

**Daniel Joseph MEINDL, Defendant.**

**No. 99–40075–01–SAC.**

United States District Court,
D. Kansas.

Dec. 17, 1999.

---

Gregory G. Hough, Office of United States Attorney, Topeka, KS, for plaintiff.

David J. Phillips, Office of Federal Public Defender, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant's motion to suppress (Dk.19) to which the government has filed its opposing response (Dk.21). The defendant seeks to suppress evidence seized from the search of his residence on December 29, 1998, and from the search of his car on February 3, 1999. The court conducted an evidentiary hearing on November 30, 1999, during which the government presented the testimony of four law enforcement officers. Following the testimony, counsel agreed to waive oral argument and submit the matter on the memoranda already filed with the court. Having reviewed the parties' filings, weighed the evidence, and researched the relevant issues, the court is ready to rule.

## INDICTMENT

On August 4, 1999, the grand jury returned a six-count indictment against the defendant Daniel Joseph Meindl. The first two counts (1 & 2) relate to criminal conduct evidenced by items discovered during a search of the defendant's residence on December 29, 1998. The defendant's motion to suppress challenges this search. The second two counts (3 & 4) relate to criminal conduct evidenced by items discovered following an investigatory stop of the defendant's vehicle on February 3, 1999. The defendant's motion to suppress challenges this stop. Counts 1, 3

and 5 charge that the defendant on different dates, in violation of 21 U.S.C. § 846, attempted to manufacture methamphetamine or a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a). Counts 2, 4 and 6 charge that the defendant on the same dates alleged in counts 1, 3 and 5 possessed a firearm during and in relation to the corresponding drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) and (2).

## HOUSE SEARCH ON DECEMBER 29, 1998.

### Findings of Fact

On December 28, 1998, two uniformed deputies with the Shawnee County Sheriff's Office, went to the defendant's residence at 2511 S.E. Michigan, Topeka, Kansas, to arrest him on a misdemeanor warrant issued by the District Court of Shawnee County, Kansas, in case No. 98TR004483, for driving while his license was suspended. The warrant showed that the district court had set a $2,500 personal surety bond. Unable to locate the defendant, the deputies did not execute the warrant, and they observed no evidence of the defendant being home.

The next day, December 29, 1998, around 10:05 a.m., three uniformed deputies driving marked patrol cars returned to the defendant's residence. As they walked up to the house, the deputies noticed that unlike the prior day their movement triggered some outdoor security lights. They knocked several times on the front door, but no one answered it. The deputies saw a television set operating in the living room. Their check of the electric meter showed it was moving at a much faster rate than the previous day.

Deputy Darrin Johnson testified that two weeks earlier they had attempted to serve a warrant on the defendant at this same house. They knocked on the door repeatedly, but the defendant did not answer. Johnson maintained surveillance of the home, as the other deputies drove off in their patrol cars. Within minutes, Johnson observed the defendant move around inside and look out a window. Johnson radioed for the others to return. The deputies again knocked and then warned that they would forcibly enter if the defendant did not answer the door. The defendant eventually answered the door.

Based on the security lights, operating television, rapidly moving electric meter and their prior experience in serving warrants on the defendant, the deputies believed the defendant was inside the house on December 29, 1998. The deputies found an unlocked window, opened it, and announced themselves several times. Receiving no response, they crawled through the window to look for the defendant whom they believed to be hiding inside. The officers saw near the window in plain view an SKS assault rifle with a collapsible stock and a thirty round banana clip on the floor next to it. The officers cleared the lower level without finding the defendant. Believing he could be armed and hiding on the second floor and having safety concerns about the narrow stairway leading to the upper floor, deputies called for a canine unit to assist in searching for the defendant upstairs.

William Heady with the Kansas Highway Patrol arrived at the defendant's residence around 11:00 a.m. with his dog, Targo. Told that officers believed the subject of an arrest warrant was hiding upstairs and was possibly armed, Trooper Heady took Targo inside. He shouted in the direction of the upstairs three times that anyone up there should sound off or a police dog would be released. Receiving no response, Heady then sent Targo after giving only the one command to search for and apprehend a person. Heady testified that from his downstairs position he heard Targo going back and forth above in a normal search pattern without barking. Heady concluded that Targo had not located any suspect. Upon hearing Targo bumping or knocking something around, troopers Heady and Moomaw headed up the stairs. When he reached the second

floor landing, Heady saw Targo pawing an opaque plastic bowl that was laying on its side with the lid off and a white powder on the floor next to the bowl. Concerned over the danger of the dog ingesting drugs, Heady immediately called off Targo and took him downstairs. Heady testified that Targo gave a positive alert to the bowl.

Because he was downstairs when Targo found the bowl, Heady said he was uncertain how the bowl came to be on the floor laying on its side with the lid off. Trooper Heady also testified that based on the noise coming from upstairs that he believed Targo had knocked the bowl around the floor. Heady recorded in his written report that Targo had removed the bowl's lid. Heady testified that this was his conclusion at the time because the bowl was on its side, the contents had spilled, and the lid was laying nearby.

Because the white powder appeared to be a drug, the Shawnee County Sheriff's narcotics officers were called to the scene. The officers on the scene stopped their search for the defendant and secured the house. A narcotics officer performed a field test of the powder that was positive for cocaine. Officers then telephoned deputy Akim Reynolds with this information, and he prepared an affidavit and warrant application. Shawnee County District Court Judge Eric Rosen granted the search warrant on December 29, 1998, at 1:15 p.m., and Reynolds delivered the warrant to the defendant's house.

Officers at Meindl's house remained inside to keep it secure and to stay warm. While waiting for the search warrant they recognized the defendant Meindl as the driver of a red LeMans that went down the alley behind the home. The warrant officers gave chase but lost the defendant. Other officers in the area located a red LeMans in the 1700 block of southeast Sage. The warrant officers went to that house and found Meindl's car parked behind it. They spoke with the resident who said that Meindl worked for him but that he did not know where Meindl was. The resident said Meindl was not inside but gave the officers permission to search the house. Finding Meindl crouched behind a dresser in a dark bedroom with a television operating, the officers arrested him and took him to his house where other officers had begun executing the search warrant.

Sometime after officers began searching for the cocaine and drug paraphernalia, deputy Reynolds realized that the warrant mistakenly directed officers to seize marijuana, instead of cocaine. Reynolds testified that he believed the officers knew of the field test results and understood they were looking for cocaine. Reynolds also explained that he had prepared the affidavit and warrant from some form documents found on his computer and had changed all references from marijuana to cocaine but simply overlooked this one reference. When he returned to his office following the search, Reynolds prepared a written report that same day identifying and explaining this mistaken reference to marijuana. Reynolds characterized this oversight as a mere typographical error.

### Arguments

The defendant argues that the deputies executing the arrest warrant unlawfully entered his dwelling, that the police dog and officers inside the home exceeded the lawful scope of the arrest warrant, and that the subsequent search warrant does not validate the improper search and seizure. The government counters that the officers relied in good faith on the arrest warrant and did not act unlawfully in entering Meindl's home and looking for him. The government further responds that the search warrant was supported by probable cause, that the issuing judge did not abandon his judicial role in issuing it, and that the warrant did not lack particularity.

### Entry Into Home in Execution of Arrest Warrant

Consistently, the Supreme Court has emphasized "the overriding respect for the sanctity of the home that has been embed-

ded in our traditions since the origins of the Republic," because unlike other locations the home "provide[s] the setting for those most intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver v. United States,* 466 U.S. 170, 178–79, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (citations omitted). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest." *Id.* (citation omitted).

In *Payton v. New York,* 445 U.S. 573, 583–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that absent probable cause and exigent circumstances the Fourth Amendment does not allow warrantless felony arrests in a dwelling. The seriousness of the offense supporting arrest is a factor relevant in determining exigent circumstances. The Supreme Court has held that the "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case [a noncriminal traffic offense], has been committed." *Welsh v. Wisconsin,* 466 U.S. at 753, 104 S.Ct. 2091; *See Howard v. Dickerson,* 34 F.3d 978, 982 (10th Cir.1994).

In *Payton,* the Supreme Court also decided that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is rea-

son to believe the suspect is within." 445 U.S. at 603–04, 100 S.Ct. 1371. "'Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.'" *Valdez v. McPheters,* 172 F.3d 1220, 1224 (10th Cir.1999) (quoting *Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "[U]nder *Payton,* police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable belief[1] that the arrestee could be found within the residence at the time of the entry." *Valdez,* 172 F.3d at 1224 (citations omitted). "[T]he officers' assessment need not in fact be correct; rather, they need only 'reasonably believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling." *United States v. Risse,* 83 F.3d 212, 216 (8th Cir.1996) (citations omitted); *see Valdez,* 172 F.3d at 1225. "'The facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.'" *Valdez,* 172 F.3d at 1224 (quoting *United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)).

■ The undisputed evidence establishes the officers went to a house that was the defendant's residence to execute the arrest warrant. The evidence also establishes that the officers had a reasonable basis at the time for believing that the defendant was home. In evaluating this factor of the *Payton* test, "'courts must be sensitive to common sense factors indicating a resident's presence.'" *Valdez* 172 F.3d at 1226 (quoting *United States v.*

---

1. "While probable cause itself is a relatively low threshold of proof, it is a higher standard than 'reasonable belief', which is, as everyone agrees, the appropriate standard." *Valdez v. McPheters,* 172 F.3d 1220, 1227 n. 5 (10th Cir.1999) (citation omitted).

*Magluta,* 44 F.3d at 1535). When the deputies arrived at the residence on December 29, 1998, they observed, unlike the previous day, that security lights were operating outside and a television was operating inside. The "operation of lights or other electrical devices" may suggest a suspect's presence. *Valdez,* 172 F.3d at 1226. From their experience in serving a different arrest warrant on the defendant just two weeks earlier, the deputies knew the defendant could consider concealing himself inside. "Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts." *Valdez,* 172 F.3d at 1226 (citation omitted). Even though no one answered the door when they knocked, the officers reasonably believed the defendant was hiding inside and did not want to acknowledge the uniformed officers who had driven up in marked patrol cars.

■ The defendant does not dispute the validity of the arrest warrant nor challenge the probable cause underlying it.[2] The defendant, however, does assert that an arrest warrant for a misdemeanor, as opposed to a felony, does not authorize officers to enter a dwelling for the purpose of executing the warrant. The defendant cites only one case, *O'Rourke v. City of Norman,* 875 F.2d 1465, 1468 n. 7 (10th Cir.), *cert. denied,* 493 U.S. 918, 110 S.Ct. 280, 107 L.Ed.2d 260 (1989), as having mentioned any such distinction. The government's brief goes no further than to cite Kansas statutes and case law regarding a law enforcement officer's general authority under state law in executing arrest warrants.[3]

In *O'Rourke,* a civil rights action was based on officers executing a nighttime search of the plaintiffs' home pursuant to a daytime bench warrant for contempt issued by a small claims court. 875 F.2d at 1466. The court held that the nighttime search was unreasonable under the Fourth Amendment as the warrant lacked any nighttime endorsement by the issuing judge. 875 F.2d at 1475. Under Oklahoma law, contempt was *sui generis,* neither civil nor criminal in character, and thus, could not qualify as a felony for which a nighttime endorsement was not required. 875 F.2d at 1471. In commenting on an office memorandum prepared by the city chief of police and admitted into evidence at trial, the Tenth Circuit noted that the memorandum omitted any discussion of the *Payton* decision. 875 F.2d at 1468. In a footnote to that comment, the Tenth Circuit observed:

> In *Payton,* the Supreme Court in a dictum stated that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within." Id.* at 603, 100 S.Ct. 1371 (emphasis added). This *Payton* dictum will not support the police action for the Court's discussion there related to an arrest warrant for a felony, *id.* at 602, 100 S.Ct. 1371, not a contempt as in this case, which is not a felony, as we discuss *infra,* slip op. at 1470–71. Moreover, the police officer's conversation with the O'Rourkes relating to the absence of Deborah Boyd from the premises left police without any reason to believe the suspect was within that dwelling. Final-

2. The government's brief says the defendant has alleged that the arrest warrant " 'was issued without probable cause.' " The court can find no such argument in the defendant's memorandum.

3. The government does not address the precedential value of this Kansas law in deciding this Fourth Amendment issue. In *State v. Ruden,* 245 Kan. 95, 774 P.2d 972 (1989), cited but not discussed in the government's brief, the Kansas Supreme Court held that the Fourth Amendment prohibited officers' nonconsensual entry into a private dwelling in execution of a bench warrant issued in a limited civil action. The court keyed on the fact that the Kansas statute authorized a bench warrant to issue without requiring a probable cause finding that a crime was committed. 245 Kan. at 104, 774 P.2d 972.

ly, that dictum in *Payton* does not undercut the determination in the *Steagald* case that an arrest warrant for a third person will not justify the search of the homeowner who is not named in the warrant. Such a search violates the homeowner's rights under the fourth amendment. *Steagald,* 451 U.S. at 211–16, 101 S.Ct. 1642.

875 F.2d at 1468 n. 7. First, this footnote was plainly dictum to the holding in *O'Rourke.* Second, beyond summarily distinguishing *Payton* on its facts, the Tenth Circuit did not say it was limiting the rule expressed there to felony arrest warrants. Third, the Tenth Circuit did not identify or discuss existing federal precedent on this very issue. Fourth, the felony criminal distinction was significant in *O'Rourke,* in part, because contempt was *sui generis* under Oklahoma law. Fifth, without even citing *O'Rourke,* the Tenth Circuit has since recognized that federal law would permit an arrest at home on a misdemeanor arrest warrant. *Howard v. Dickerson,* 34 F.3d at 981.

The contention that the rule as stated in *Payton* applies to arrest warrants for felonies only and not misdemeanors has been raised in several courts and always rejected. In *United States v. Spencer,* 684 F.2d 220 (2nd Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983), officers in executing a bench warrant issued for an unrelated misdemeanor charge entered the defendant's dwelling in his absence and legally seized evidence found during their search for him. The defendant Spencer argued that *Payton* only permitted non-consensual entrances pursuant to a felony arrest warrant. The Second Circuit was not persuaded:

> *Payton* makes clear that a person's Fourth Amendment rights are protected by interposing a neutral magistrate "between the zealous officer and the citizen." *Id.* at 602, 100 S.Ct. 1371.
>
> .... [T]he police, armed with the warrant, had authority to find and seize Spencer anywhere they could find him for his failure to appear in court [in connection with misdemeanor charges on which he had previously been arraigned]. Thus, presence of the police in the defendant's room was pursuant to a direction made by a neutral magistrate. Defendant's rights under the Fourth Amendment require no more. (citations omitted).
>
> .... While both cases [*Payton* and *United States v. Reed,* 572 F.2d 412 (2nd Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) ] concededly involved felony arrests, neither holding limits legal entrance only to felony cases. Significantly, in the more recent case of *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Court, in referring to *Payton,* placed no limitation on the kind of crime with which the suspect must be charged. In these cases, the courts, in striving to safeguard a suspect's Fourth Amendment rights when he is arrested at home, emphasized the necessity that a warrant be issued by a neutral magistrate. The concern has been to present the unreasonable seizure of a person or property. In determining reasonableness, the nature of the underlying offense is of no moment.

Defendant seems to argue that we should grant a misdemeanor suspect blanket protection from arrest while such person remains at home. The maxim that "a man's home is his castle" has come to us from the early English common law through the corridors of time. The ancestry of this concept and its significance in our constitutional history are thoroughly explored in *Payton,* 445 U.S. at 591–98, 100 S.Ct. 1371. The discussion makes clear that the threshold of one's home, however, is not a boundary—like the Yalu River—beyond which a suspect has inviolate sanctuary. Instead this defendant, subject to the outstanding bench warrant, is not insulated by *Payton* from being arrested in his home, as long as the police had reason to believe he was there.

684 F.2d at 223–24. Thus, the court found that the defendant's Fourth Amendment rights were not violated by the seizure of evidence from his closet when officers in executing a misdemeanor arrest warrant searched his apartment for him. *Id.* at 224.

More recently, a federal district court confronted this same issue and relied on *Spencer* for its conclusion. *Smith v. Tolley,* 960 F.Supp. 977, 989–92 (E.D.Va. 1997). The court noted that the Supreme Court in *Payton* and *Welch* had "recognized a distinction between felonies and misdemeanors in the context of *warrantless* arrests in a suspect's dwelling." 960 F.Supp. at 990. Like the Second Circuit, the district court keyed on the language in *Payton* that an arrest warrant is sufficient protection by " 'interpos[ing] the magistrate's determination of probable cause between the zealous officer and the citizen.' " 960 F.Supp. at 991 (quoting *Payton,* 445 U.S. at 602–03, 100 S.Ct. 1371). "Once that judicial approval was given, it makes no federal, constitutional difference that the warrant was issued in the form of a bench warrant for failure to appear on a misdemeanor offense, as opposed to a felony offense." *Id.* (footnote omitted).

Other federal courts have had no difficulty finding a lawful entry by officers in execution of misdemeanor arrest warrants. *Kain v. Nesbitt,* 156 F.3d 669, 670, 672 (6th Cir.1998) (misdemeanor arrest warrant for traffic offenses authorized officers to forcibly enter the residence and arrest the person named in the warrant); *United States v. Albrektsen,* 151 F.3d 951, 953–54 (9th Cir.1998) (misdemeanor arrest warrants authorize entry into dwelling if necessary to secure arrest); *Lyles v. City of Barling,* 17 F.Supp.2d 848, 851 855–56 (W.D.Ark.1998), *aff'd,* 181 F.3d 914 (8th Cir.1999); *Hunter v. Smith,* 1996 WL 426541, at *2 (E.D.Mich. Feb.2, 1996) (bench warrants are within the *Payton* rule), *aff'd,* 110 F.3d 64, 1997 WL 144194 (6th Cir. Mar. 27, 1997) (Table). State courts also have refused to distinguish between felony and misdemeanor arrest warrants upholding officers' entry into

dwellings in the execution of misdemeanor arrest warrants. *See, e.g., State v. Coma,* 133 Idaho 29, 981 P.2d 754, 756–57 (Idaho Ct.App.1999); *People v. LeBlanc,* 60 Cal. App.4th 157, 70 Cal.Rptr.2d 195, 198–99 (1997); *Archer v. Com.,* 26 Va.App. 1, 492 S.E.2d 826, 831 (Va.App.1997); *cf. People v. O'Hearn,* 931 P.2d 1168, 1174 n. 7 (Colo. 1997)

The weight of authority persuades the court that *Payton* is not limited to the execution of felony arrest warrants and that officers serving a misdemeanor arrest warrant have the limited authority to enter a suspect's residence when the officer reasonably believes the suspect is present. Having found that the deputies here reasonably believed the defendant was present, the court concludes the deputies lawfully made a forced entry into the defendant's dwelling.

*Actions Inside the Home*

While the arrest warrant need not explicitly authorize every police action taken in the home, "the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." *Wilson v. Layne,* 526 U.S. 603, ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). In executing the arrest warrant in a home, the officers may conduct a protective sweep incident to the arrest to protect themselves or others. *United States v. Lauter,* 57 F.3d 212, 216 (2nd Cir.1995). "The Fourth Amendment allows a protective sweep if police have 'a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others.' " *United States v. Smith,* 131 F.3d 1392, 1396 (10th Cir.1997) (quoting *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (quotations and citations omitted)), *cert. denied,* 522 U.S. 1141, 118 S.Ct. 1109, 140 L.Ed.2d 162 (1998). "The search must be 'narrowly confined to

a cursory visual inspection of those places in which a person might be hiding,' . . ., and may last 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.' " *United States v. Smith,* 131 F.3d at 1396 (quoting *Maryland,* 494 U.S. at 327, 335–36, 110 S.Ct. 1093). Likewise, if lawfully within the premises to make an arrest, the police may search the premises in order to locate the individual to be arrested. *United States v. Passarella,* 788 F.2d 377, 381 n. 4 (6th Cir.1986); see also *Maryland v. Buie,* 494 U.S. at 330, 110 S.Ct. 1093 ("It is not disputed that until the point of Buie's arrest the police had the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found."). Even if no arrest was made, officers could lawfully conduct a limited search of the defendant's residence to determine whether he was hiding inside.

■ The defendant contends that the dog's actions in knocking over the opaque bowl and exposing its contents constitutes a canine search without probable cause and not a mere canine sniff or a "plain smell" case. The government says there is no evidence, only speculation, that the dog opened the container. The government maintains this argument is frivolous because the officers did not open the bowl and simply found the white powder in plain view.

The court can find no Fourth Amendment violation in the officer's use of a canine in these circumstances to execute an arrest warrant. Considering the obvious and potentially serious risk to their own safety, the officers acted quite reasonably in calling a canine unit to clear the second floor. The uncontradicted evidence is that Trooper Heady sent his dog, Targo, upstairs after commanding Targo to search for a person, not drugs, and bark at anyone found.[4] There is no indication from the evidence that Heady permitted

Targo to remain upstairs alone for any period longer than reasonably necessary to follow through with the command to search for a person. Thus, the court finds nothing unconstitutional in releasing Targo to perform an unsupervised search for persons. Nor does this case resemble one where officers illegally place or use enhanced searching devices inside a home.

■ The defendant contends the plain view exception is inapplicable as the canine sniff here was a search in a home, not a public place. The court rejects this contention. First, "[a] canine sniff itself does not implicate Fourth Amendment rights because of the limited information it provides and its minimal intrusiveness." *United States v. Hunnicutt,* 135 F.3d 1345, 1350 (10th Cir.1998) (citing *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)); *see United States v. Nicholson,* 144 F.3d 632, 636 (10th Cir. 1998). "Official actions, such as sniffs and field tests, which reveal *only* whether an illegal substance may be present and little else, compromise no legitimate expectation of privacy." *United States v. Nicholson,* 144 F.3d at 636; *United States v. Morales–Zamora,* 914 F.2d 200, 204–05 (10th Cir.1990) ("Together *[United States v.] Jacobsen* [, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ] and *Place* make clear that there is no intrusion on legitimate privacy interests (and hence no 'search') where the only information revealed is limited to contraband items." (citation omitted)). In a recent case where the defendant moved to suppress evidence obtained from a dresser drawer opened by a canine sent into an apartment to search for intruders, the Sixth Circuit affirmed the denial of the defendant's motion, stating:

Just as the sniffing of contraband by trained canines does not constitute an unlawful search, neither does the viewing by humans of contraband in plain sight amount to an unlawful search. As long as the observing person or the

---

4. Trooper Heady further testified that a different command is used when Targo searches

for drugs and that Targo had always responded appropriately to the different commands.

sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred. In addition, just as contraband in plain view may be seized if legally accessed and may also provide probable cause to obtain a search warrant, so, too, "[a] positive reaction by a properly trained narcotics dog can establish probable cause for the presence of controlled substances." *United States v. Berry*, 90 F.3d 148, 153 (6th Cir.) (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994)), *cert. denied*, 519 U.S. 999, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996).

*United States v. Reed*, 141 F.3d 644, 649 (6th Cir.1998). "Just as evidence in the plain view of officers may be searched without a warrant, evidence in the plain smell may be detected without a warrant." *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir.1997) (citations omitted).

■ Second, the court is not persuaded that the canine sniff of drugs became a search here when it happened by chance during a constitutionally proper search for a person inside a home. The defendant cites *United States v. Thomas*, 757 F.2d 1359 (2nd Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), in which the court distinguished *Place* as involving luggage in a public place in holding that a canine sniff in an exterior hallway "impermissibly intruded" on the resident's heightened privacy interest in his apartment. *But see United States v. Roby*, 122 F.3d at 1125 ("[A] trained dog's detection of odor in a common corridor [of a motel] does not contravene the Fourth Amendment."). "*Thomas* seems to stand alone in its pronouncement that a canine sniff may constitute an unreasonable search." *United States v. Reed*, 141 F.3d at 649–50. Its holding conflicts with the fundamental principle taken from *Place* and *Jacobsen* that legitimate privacy interests are not intruded when the information being revealed is limited to contraband. *Id.* at 650. As long as the canine unit is lawfully pres-

ent when the sniff occurs, the "canine sniff is not a search within the meaning of the Fourth Amendment." *United States v. Reed*, 141 F.3d at 650. "The fact that the dog, as odor detector, is more skilled than a human, does not render the dog's sniff illegal." *United States v. Roby*, 122 F.3d at 1124–25.

■ Any contraband seen by the deputies or smelled by Targo came within the plain-view doctrine or the canine-sniff rule. *United States v. Reed*, 141 F.3d at 651. Assuming Targo did knock over the opaque container and expose its contents, a matter which has not been established to the court's satisfaction, this conduct still would not constitute an illegal search. In *Reed*, the defendant argued the dog in opening the dresser drawer had exceeded the scope of consent to search for intruders in his apartment. The Sixth Circuit upheld the conduct:

This is so because the movement of the drawers, if any, would have been occasioned by Cheddy's [the dog's] instinctive reactions to the nature of the contraband. Indeed, at least two circuits have found that, absent police misconduct, the instinctive acts of trained canines, such as trying to open a container containing narcotics, does not violate the Fourth Amendment. *See United States v. Lyons*, 957 F.2d 615, 617 (8th Cir. 1992); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir.1989).

141 F.3d at 650. In *Stone*, a trained dog properly sniffing the exterior of a stopped car suddenly jumped into the car's interior. The Tenth Circuit held:

Even though the police could use a trained dog to sniff the exterior of Stone's automobile, the dog created a troubling issue under the Fourth Amendment when it entered the hatchback. People have a reasonable expectation of privacy in the interiors of their automobiles; police may not search an automobile unless they have probable cause to believe to contains contraband. (citation omitted).

. . . .

We agree with the district judge that the dog's instinctive actions did not violate the Fourth Amendment. There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car. (citation omitted). . . . . In these circumstances, we think the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics. 866 F.2d at 363–64; *see also United States v. Winningham*, 140 F.3d 1328, 1330–31 (10th Cir.1998). Like the courts in *Stone* and *Reed*, this court finds that under the circumstances here Targo's instinctive response to the odor of narcotics coming from the bowl does not constitute an illegal search. Targo was properly trained to give an aggressive response. "Moreover, the alert itself provided sufficient probable cause for the warrant to issue, such that [the officer's] observation was not critical in any event." *United States v. Reed*, 141 F.3d at 650. A trained dog's alert to a container provides probable cause to open and search it. *United States v. Blaze*, 143 F.3d 585, 592 (10th Cir.1998).

 A police officer that is lawfully in a home can seize items in "plain view" without running afoul of the Fourth Amendment, if the incriminating character of the article (as contraband or evidence of a crime) is immediately apparent. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 66, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). "A visual inspection of that which is in plain view does not constitute a search." *United States v. Nicholson*, 144 F.3d at 636. There is no question that the upstairs was an appropriate place to look when searching the house for Meindl. Officers having lawful access may seize incriminating items found in plain view, subject to two additional requirements: "(1) officer was lawfully in a position from which to view the object seized in plain view; and (2) the object's incriminating character was imme-

diately apparent—i.e. the officer had probable cause to believe the object was contraband or evidence of a crime." *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir.1994) (citing *Horton v. California*, 496 U.S. 128, 130–31, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). "The officer need not come across the seized item inadvertently." *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir.1996) (citing *Horton v. California*, 496 U.S. at 130–31, 110 S.Ct. 2301), *cert. denied*, 520 U.S. 1178, 117 S.Ct. 1453, 137 L.Ed.2d 558 (1997); *see United States v. Le*, 173 F.3d 1258, 1268 (10th Cir.1999). The officers here trained in the detection of controlled substances immediately noticed that the white powder residue in plain view strongly resembled a controlled substance. Armed with probable cause by reason of their own observations and Targo's alert, the officers lawfully seized the powder and secured the premises while waiting on other officers to arrive and perform a field test. Because a field test reveals nothing more than whether the substance is illegal, it "does not constitute a search." *United States v. Nicholson*, 144 F.3d at 636. When the test results were positive for cocaine, the officers sought and obtained a search warrant for the residence.

### Search Warrant's Erroneous Reference to Marijuana

 The warrant issued on December 29, 1998, includes the district court's finding of probable cause to believe that the offenses of "Possession of Cocaine, Possession of Drug Paraphernalia, and No Kansas Drug Tax Stamp" had been committed and that "marijuana" and drug paraphernalia are located on the premises at 2511 S.E. Michigan. The defendant argues this unexplained and unsupported reference to marijuana in the warrant undermines any officer's claimed good faith reliance on the warrant.

The evidence of record, including Detective Reynolds' testimony, and the recitation of facts in the supporting affidavit

with the specific reference to the offense of cocaine possession, the court concludes that the reference to "marijuana" in the warrant is nothing more than a word processing error overlooked by the issuing judge. The record does not provide any reasonable basis for inferring that the issuing judge was confused over which controlled substance that the officers believed they had discovered in the defendant's residence. Nor is there any indication that the officer intentionally attempted to mislead the issuing judge. That the issuing judge did not detect this error in no way justifies the sweeping conclusion that the issuing judge abandoned his judicial role or otherwise acted in anything but a neutral and detached fashion. Furthermore, there are no other facts in the record that would lead the police officers to believe that the magistrate was not acting in a neutral and detached fashion, consistent with his judicial role. Therefore, the court rejects the defendant's effort to prevent the officers from relying in good faith on the search warrant issued on the defendant's residence. The court denies the defendant's motion to suppress the evidence seized from the search of his house on December 29, 1998, and his statement given that afternoon.

## CAR STOP ON FEBRUARY 3, 1999

### Findings of Fact

Around 1:55 a.m., while on patrol in a marked vehicle, Deputy Gabe Garcia with the Shawnee County Sheriff's Department pulled into Petro Deli convenience store located near the intersection of 46th Street and Highway 75. Although this was not a high crime area, local bars closed around this time,[5] and Deputy Garcia was keeping a look out for drivers under the influence. As he drove into the parking lot, Garcia observed a white male, later identified as the defendant, having a "heated discussion" with another white male who was using a pay telephone. Garcia described the defendant's physical appearance as not

well kept, and even dirty. Unable to hear their conversation, the deputy concluded the men were arguing based on their hand gestures and body positions. He also inferred from the animated physical gestures that the defendant appeared "rather angry" and the aggressor of the two. Concerned about the situation possibly escalating into a fight, Garcia watched the two men and slowed down his patrol car as they noticed him. Based on his experience, Garcia opined that the defendant's animated and aggressive demeanor was consistent with someone under the influence of alcohol or drugs.

The defendant appeared "real nervous" and "very surprised" upon seeing the deputy. The defendant stopped everything he was doing and abruptly walked to his car that was parked near the pay phone. The defendant immediately backed his car up and drove out of the parking lot. Because of the defendant's demeanor and unusual nervousness upon seeing him, Garcia suspected that the defendant was under the influence of alcohol or drugs. Instead of stopping the defendant at this point, Garcia decided to follow the defendant's car and make a registration check on it and look for such things as erratic driving, unusual speed changes and traffic violations which would further confirm his suspicion. Because of his training and practice, Garcia usually runs a registration check prior to a traffic stop, if possible, in an effort to learn whether there are any risks of the situation becoming dangerous.

The deputy caught up with the defendant's car and saw a thirty-day tag in the rear window, but he was unable to make out the numbers on it while maintaining a safe distance between the cars.[6] Garcia testified it would have been apparent to the defendant at this point that he was being followed by a police car. As Garcia caught up with the defendant's car, it immediately signaled and turned north on

---

5. He also testified that the convenience stores are often busy this time of night.

6. In fact, Garcia testified that he never could see the numbers well enough to make a registration check prior to the traffic stop.

the first available street. The defendant's car went less than fifty yards on Button Street and pulled all the way into the driveway of the first residence on that street. Button Street is less than one-half mile east of the convenience store.

Garcia drove past the defendant's parked car, blacked out his lights, and turned around to watch the defendant. Garcia never saw anyone get out of the defendant's car. Less than ten seconds later, Garcia saw the defendant's car back out of the driveway and head south on Button in the opposite direction. The defendant's car turned and was headed east on 46th Street, when Garcia reached the intersection. Garcia followed and caught up with the defendant's car when it again immediately signaled and turned on the first available street. The name of this street was also Button which resumes south off of 46th Street approximately 150 yards east.

Garcia also turned south onto Button Street. The deputy observed no other traffic on these streets. The defendant's car, a rusted 1989 Pontiac, went less than 100 yards on Button and turned east onto Half–Day Lane which curves back in a semi-circle to Button. Garcia described the residences in this area as ranging in value from $200,000 to $500,000 and more. Even though the defendant had not committed any observable traffic violation, Garcia concluded that the defendant was acting "very suspicious and elusive" and that defendant's evasive and unusual driving patterns necessitated further investigation to determine whether he was under the influence. The deputy activated his emergency lights and the defendant promptly pulled his car into a driveway.

Garcia pulled up behind the stopped car, and the defendant immediately exited and headed towards the patrol car in an angry manner. Ignoring Garcia's order to return to his car, the defendant kept approaching and began shouting obscenities at the deputy. The deputy drew his firearm and ordered the defendant to get to the ground. The defendant continued to ignore Garcia's orders and yelled for Garcia "to shoot him." After repeatedly being ordered to get on the ground, the defendant said, "Fuck you, I'm leaving," and ran between the residences and in the direction of the woods. Garcia gave chase until he realized that he had never radioed in his stop or location.

Garcia then returned to his patrol car and called in the information and asked for assistance from a canine unit and the Topeka police helicopter. Garcia checked the defendant's car for other occupants. The driver's door on the defendant's car was open, and Garcia saw a knife in a sheath and a holstered gun on the driver's floor board near the center console. Garcia called in the registration number on the 30–day tag and learned that the defendant lived on the other side of the county in southeast Topeka, that he had a suspended driver's license, and that he had a misdemeanor warrant in Shawnee County and a felony warrant in Osage County. Garcia testified that the defendant would have been arrested and his car impounded if he had not run off.

Garcia stayed with the defendant's car for a couple of hours, and Meindl never returned. Consistent with department policy on abandoned vehicles, the deputy had the defendant's car impounded, and he inventoried its contents at the scene. In the trunk, Garcia found a glass jar containing a grayish liquid with white substance settled on the bottom. Believing the jar to contain possible ingredients for methamphetamine, Garcia called in Special Services to handle the hazardous matter search.

### Arguments

The defendant contends he was stopped without probable cause or an articulable reasonable suspicion. The defendant attacks the different factors articulated by Deputy Garcia as far from sufficient to suspect that criminal activity was afoot. The defendant maintains his evasive driving manners alone cannot provide reasonable suspicion. The defendant denies vol-

untarily abandoning his car and argues it was the direct result of his unlawful traffic stop. The government argues the different factors do sustain a reasonable suspicion for stopping the defendant's car.

### Relevant Law

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). Because the temporary stop of an automobile is considered a seizure of "persons," it must not be "unreasonable." *Id.* "[A] traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred, (citation omitted), or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir.1999) (internal quotation marks and citation omitted).

■■■ An ordinary traffic stop is like an investigative detention and is analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Hunnicutt*, 135 F.3d at 1348. " 'An investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime.' " *United States v. Henning*, 906 F.2d 1392, 1395 (10th Cir. 1990) (quoting *United States v. Espinosa*, 782 F.2d 888, 890 (10th Cir.1986)), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991), *modified on other grounds, United States v. Moore*, 958 F.2d 310 (10th Cir.1992); *see United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996). Thus, a traffic stop is valid not only when an officer observes a traffic violation but when the officer "has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occur-

ring." *United States v. Hunnicutt*, 135 F.3d at 1348.

■■■ To have "reasonable suspicion" of criminal activity, "the officer must acquire a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States v. Villa–Chaparro*, 115 F.3d 797, 801–02 (10th Cir.), *cert. denied*, 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997). "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity." *United States v. Hunnicutt*, 135 F.3d at 1349. "The law does not specify a minimum of factors necessary to constitute reasonable suspicion." *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997) (citation omitted), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998).

Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, " 'as understood by those versed in the field of law enforcement.' " *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "Police officers need not close their eyes to suspicious circumstances." *Hunnicutt*, 135 F.3d at 1349 (citation omitted). Indeed, the officer "is entitled to assess the facts in light of his experience" when it comes to detecting criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (citation omitted). On the other hand, an officer may not detain someone on an "unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. "While the necessary 'level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence,' the Fourth Amendment requires 'some minimal level of objective justification.' " *United States v. Gutierrez–Daniez*, 131 F.3d at

942 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotations omitted)). In other words, to support a finding of reasonable suspicion, the officer must be able to point to specific and articulable facts, rather than a mere hunch. *United States v. Soto–Cervantes*, 138 F.3d 1319, 1322 (10th Cir.), *cert. denied*, 525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998).

■ In evaluating the factors alleged in support of reasonable suspicion, the court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d at 1431 (citation omitted). "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez–Daniez*, 131 F.3d at 941 (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996)). In *Mendez*, the Tenth Circuit summarized the court's approach in this way:

> "Our task ... is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," *United States v. Lopez–Martinez*, 25 F.3d 1481, 1484 (10th Cir.1994), but rather to determine whether the totality of the circumstances justify the detention. [*United States v.*] *McRae*, 81 F.3d [1528] at 1534 [ (10th Cir.1996) ]. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, *id.*, remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation omitted). .... Although activities entirely consistent with innocent travel can, and frequently do, contribute to reasonable sus-

picion, *id.* at 9, 109 S.Ct. 1581, some facts are so innocuous and "so susceptible to varying interpretations" that they carry little or no weight. *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996).

118 F.3d at 1431. "The government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998).

### Analysis

■ This case presents a particularly close issue on reasonable suspicion. While such factors as nervousness and evasiveness play a relevant part in the reasonable suspicion calculus, the case law shows that the courts generally have not accorded much weight to them in traffic stop cases. This case, however, differs from the ordinary traffic stop situation in several respects, but most critically, in the officer's opportunity to assess the defendant's suspicious behavior even before the defendant began driving a car. The unique circumstances of this case convince the court that these factors and the others, when considered in combination, just barely clear the reasonable suspicion threshold.

Animated and aggressive behavior in an open and public setting around 2:00 a.m., shortly after the bars have closed, is conduct that a reasonable patrol officer looking for drivers under the influence of alcohol or drugs would find suspicious. Meindl's angry demeanor was so noticeable and extreme that Garcia believed his presence was needed to deter Meindl from escalating the heated discussion into a physical fight. Instead of bringing himself under some semblance of control when he saw Garcia's patrol car approach, Meindl reacted nervously, immediately walked to his car and drove away. The rational inference to be drawn is that Meindl judged it more important that he avoid any contact with the officer than continue with pursuing whatever had caused him to become so angry.

The early morning hours, the indiscreet display of aggressive and animated behavior in a public setting, the unusually nervous reaction to seeing a patrol car and the abrupt withdrawal from a situation otherwise important enough to anger the defendant created a suspicious portrait particularly given the due deference accorded a law enforcement officer's judgment and ability to recognize suspicious behavior. *See United States v. De la Cruz–Tapia,* 162 F.3d 1275, 1279 (10th Cir. 1998). When the defendant began driving away, Garcia had reasonable suspicion that a traffic violation was occurring, namely, that the defendant was driving under the influence of alcohol or drugs. Viewed together, the above factors would not encompass a large number of presumably innocent travelers. *See Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (holding that reasonable suspicion was absent when the defendant fit some of the drug courier profile characteristics and made some possibly evasive movements because of possible applicability to a large number of innocent people). Considering Meindl's agitated demeanor, Garcia reasonably chose to attempt a registration check before stopping him.

When Garcia caught up with the defendant's car in an effort to read the temporary permit posted in the back window, Meindl immediately began a series of driving maneuvers that lacks a reasonable and innocent explanation. It is true that Garcia did not observe Meindl commit any traffic violations in driving probably no more than one mile total. While this fact does weigh against the suspicion of Meindl being under the influence of alcohol or drugs, it is more than offset by what can only be explained as Meindl's repeated attempts to evade the patrol car.[7] Each time that Meindl recognized the patrol car

behind him, he immediately reacted by taking the first available turn. Meindl even attempted to lose the patrol car by faking a residential stop when he pulled all the way into the first private driveway on Button Street and waited until the officer passed out of sight. One could reasonably infer an impaired judgment from such immature overreactions by a forty-year-old driver operating the only other car on these residential streets. Another rational inference that can be drawn is that Meindl judged his circumstances serious enough to operate his car in a blatantly evasive manner in order to avoid any contact with the officer. Having reasonable suspicion that the defendant was under the influence of alcohol or drugs, Garcia activated his emergency lights and lawfully stopped the defendant's car.

The defendant argues he did not voluntarily abandon his car as it was the fruit of an unlawful stop. By reason of the court's finding that Garcia had reasonable suspicion to make the traffic stop, the defendant's argument runs aground. Additionally, the court finds that the defendant did not retain any reasonable expectation of privacy in his car. *United States v. Austin,* 66 F.3d 1115, 1118 (10th Cir.1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 799, 133 L.Ed.2d 747 (1996). He parked the car in a private driveway without any apparent permission from the landowner. He announced to Garcia that he was "leaving" and said nothing about returning before he ran off on foot into the woods. Garcia learned that the defendant lived in southeast Topeka on the other side of Shawnee County. He left the driver's side door wide open on the car. The defendant did not return for his car over the next couple of hours that Garcia was on the scene. Pursuant to his department's poli-

7. " '[B]ehavior which evinces in the mind of a reasonable police officer an intent to flee from the police is sufficiently suspicious in and of itself to justify a temporary investigative stop by the police.' " *United States v. Silva,* 957 F.2d 157, 160 (5th Cir.) (quoting 3 W. La-Fave, *Search and Seizure* § 9.3(c), at 69–70 & n. 164.1 (West 1987 & Supp.1991)), *cert. denied,* 506 U.S. 887, 113 S.Ct. 250, 121 L.Ed.2d 182 (1992). "[S]trange movements in his attempt to evade the officers aroused further justifiable suspicion." *Florida v. Rodriguez,* 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984).

cy, Garcia deemed the car abandoned, had it impounded, and inventoried its contents before it was moved. There is no evidence to suggest the inventory search here was conducted contrary to standardized procedures or as a ruse or pretext. For all these reasons, the court denies the defendant's motion to suppress the evidence seized from the search of his car on February 3, 1999.

IT IS THEREFORE ORDERED that the defendant's motion to suppress (Dk.19) is denied.